UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **ANTONIO WILLIAMSON**<br>c/o Spangenberg Shibley & Liber LLP<br>1001 Lakeside Ave. East, Suite 1700<br>Cleveland, OH 44114 | CASE NO. 5:21-cv-565<br><br>JUDGE JOHN R. ADAMS |
| Plaintiff, | |
| vs. | |
| **SHERIFF KANDY FATHEREE, *in her officacity as Summit County Sheriff*,**<br>Summit County Sheriff's Office<br>53 University Ave.<br>Akron, OH 44308 | **FIRST AMENDED COMPLAINT**<br><br>*[Jury Demand Endorsed Hereon]* |
| and | |
| **CITY OF AKRON**<br>Akron Police Department<br>217 S High Street<br>Akron, OH 44308 | |
| and | |
| **DET. JEROME PATRICK MCMILLAN**<br>Akron Police Department<br>217 S High Street<br>Akron, OH 44308 | |
| and | |
| **LT. GERALD E. FORNEY**<br>Akron Police Department<br>217 S High Street<br>Akron, OH 44308 | |
| and | |

**DET. JASON KLINE**                                )
Summit County Sheriff's Office              )
53 University Ave.                                   )
Akron, OH 44308                                   )
                                                             )
    and                                            )
                                                             )
**FMR. SHERIFF STEVE BARRY**            )
Summit County Sheriff's Office              )
53 University Ave.                                   )
Akron, OH 44308                                   )
                                                             )
    and                                            )
                                                             )
**INS. CHRIS RHOADES, SR.**                )
Summit County Sheriff's Office              )
53 University Ave.                                   )
Akron, OH 44308                                   )
                                                             )
             Defendants.                         )

_____

Now comes Plaintiff, Antonio Williamson, and for his First Amended Complaint against the above-named Defendants, states and avers as follows:

## **INTRODUCTION**

1.      Plaintiff Antonio Williamson is a former Lieutenant with the Summit County Sheriff's Office who was maliciously prosecuted for serious crimes he did not commit. He was fired from his job without just cause, including because of his race. Mr. Williamson worked in Internal Affairs, tasked with investigating the alleged wrongdoing of his fellow deputies, and was one of only a handful of African Americans in the entire Sheriff's Office holding a supervisory role at the time. Mr. Williamson never had a single citizen complaint against him substantiated during his career as a law enforcement officer.

2.      In March of 2017, a woman complained to the Akron Police Department that an unnamed, African American Summit County Sheriff's deputy forced her to give him

oral sex. The Summit County Sheriff's Office immediately offered Mr. Williamson as the only suspect, despite the fact that he did not match the woman's description – aside from being black.

3.      When DNA and physical evidence excluded Mr. Williamson as a suspect, City of Akron investigating officers persisted. Akron investigators made false and misleading statements and omitted critical evidence and information in police reports and affidavits in order to initiate and further a criminal prosecution against Mr. Williamson, all without probable cause and in violation of the United States Constitution.

4.      As a result of these false statements and material omissions, Mr. Williamson was indicted on charges of rape, kidnapping, sexual battery, and gross sexual imposition. Mr. Williamson steadfastly maintained his innocence.

5.      While the rape, kidnapping, sexual battery, and gross sexual imposition charges were pending against Mr. Williamson, the Summit County Sheriff's Office (sometimes hereinafter, "SCSO"), under former Sheriff Steve Barry, undertook an investigation against Mr. Williamson for alleged improper use of the Ohio Law Enforcement Gateway ("OHLEG") for searching his own name in the OHLEG database – a widespread and longstanding practice at SCSO at the time. Mr. Williamson's uses of OHLEG were lawful and approved by supervisors, and otherwise common practice amongst SCSO deputies. Regardless, however, no other SCSO Deputy had ever been referred for criminal prosecution for established misuse of OHLEG, much less for engaging in the common practice of searching one's own name in the database, and no other deputy was fired for engaging in this practice, either.

6.      On January 2, 2018, a supplemental indictment was issued charging Mr. Williamson with 10 additional counts for criminal OHLEG misuse.

7.      On April 16, 2018, the Summit County Sheriff's Office held an administrative hearing regarding Mr. Williamson's alleged improper use of OHLEG.

8.      During the hearing, Mr. Williamson's union representative explained that each self-search had a legitimate law enforcement purpose, related either to Mr. Williamson's own performance reviews or his training of younger deputies. Armed with this new information, the Summit County Sheriff's Office could have investigated further to corroborate whether the self-searches were conducted in connection with a legitimate law enforcement purpose but chose not to do so.

9.      On or about April 19, 2018, the Summit County Sheriff terminated Mr. Williamson's employment for his alleged improper uses of OHLEG.

10.     The Summit County Sheriff's termination of Mr. Williamson's stellar, nineteen-year employment with the SCSO, for engaging in a practice for which no white deputies, including the investigating officer himself, were fired, was discriminatory and unlawful.

11.     On July 7, 2018, the Summit County Common Pleas court severed the sexual assault-related charges from the OHLEG misuse-related charges for purposes of trial.

12.     Shortly before trial on the sexual assault-related charges, Summit County prosecutors dismissed the rape and kidnapping counts. Then, on March 10, 2020, after a ten-day jury trial, Mr. Williamson was acquitted on all remaining charges stemming from

the sexual assault incident alleged against him in March 2017. The OHLEG misuse-related charges and prosecution remained pending against Mr. Williamson.

13.     On May 1, 2023, Judge Rowlands granted the Summit County prosecutor's Motion to Dismiss the remaining OHLEG charges against Mr. Williamson with prejudice. Summit County's voluntary dismissal with prejudice of the charges against Mr. Williamson is further evidence that the Summit County Sheriff's termination of Mr. Williamson was unlawful, pretextual, and discriminatory.

14.     Through this lawsuit, Mr. Williamson now seeks relief for violations of his rights secured and guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, the laws of the United States, and the laws of the State of Ohio. Mr. Williamson pursues the claims set forth herein below under Title 42 § 1983 of the United States Code and Ohio common and statutory law.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as certain claims asserted herein arise under the Constitution and laws of the United States, to wit, the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

16.     Pendant jurisdiction over the state law claims asserted herein is invoked pursuant to 28 U.S.C. § 1367.

17.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

18.     Plaintiff Antonio Williamson is a former Lieutenant with the Summit County Sheriff's Office, residing in the Northern District of Ohio. Plaintiff is a citizen of the United States and is entitled to the protections of the Constitution and laws of the United States of America and the State of Ohio. Plaintiff's employment with the Summit County Sheriff's Office was wrongfully terminated on or about April 19, 2018.

19.     At all times relevant, Defendant Summit County Sheriff Kandy Fatheree or her predecessor, former Summit County Sheriff Steve Barry, was the lawful Sheriff of Summit County, Ohio and, through the Summit County Sheriff's Office and its employees and agents, was the Sheriff of a duly authorized law enforcement agency, with the ability to sue and be sued, residing in Summit County in the Northern District of Ohio. Defendant Sheriff Fatheree is sued in her official capacity and all references to Defendant Sheriff Fatheree herein include reference to former Summit County Sheriff Steve Barry in his official capacity. Defendant Sheriff Fatheree is white.

20.     Defendant Sheriff Fatheree is a "person" as defined under 42 U.S.C. § 1983.

21.     At all times relevant, Defendant Sheriff Fatheree was responsible for the administration, operation, training, and supervision of the Summit County Sheriff's Office and its employees, and for the promulgation, enforcement, and review of rules, regulations, policies, customs, and practices relevant thereto, and was acting under color of law in her official capacity.

22.    At all times relevant, Defendant City of Akron was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio residing in the Northern District of Ohio acting under the color of law.

23.    Defendant City of Akron is a "person" as defined under 42 U.S.C. § 1983.

24.    Defendant City of Akron is responsible for the administration, operation, training, and supervision of law enforcement officers and for the promulgation, enforcement and review of rules, regulations, policies, customs, and practices relevant thereto.

25.    At all times relevant, Defendants Jerome Patrick McMillan and Gerald E. Forney were and are law enforcement officers employed by the City of Akron acting under the color of law and within the course and scope of their employment residing in the Northern District of Ohio. Defendants McMillan and Forney are white.

26.    At all times relevant, Defendant Jason Kline is and was a law enforcement officer employed by the Summit County Sheriff's Office acting under the color of law and within the course and scope of his employment residing in the Northern District of Ohio. Defendant Kline is white.

27.    At all times relevant, and until January 3, 2021, Defendant Steve Barry was the lawful Sheriff of Summit County, acting under the color of law and within the course and scope of his position as Sheriff. Defendant Barry is white.

28.    At all times relevant, Defendant Chris Rhoades, Senior is and was a law enforcement officer employed by the Summit County Sheriff's Office acting under the color of law and within the course and scope of his employment residing in the Northern

District of Ohio. Defendant Rhoades was Plaintiff's direct supervisor at the time of Plaintiff's termination from SCSO. Defendant Rhoades is white.

29.    At all times relevant, Defendants McMillan, Forney, Kline, Barry, and Rhoades were and are "persons" as defined under 42 U.S.C. § 1983 and/or R.C. § 4112.01(A)(1) and are being sued herein in their individual capacities.

## GENERAL FACTUAL ALLEGATIONS

### Background

30.    Plaintiff Antonio Williamson was hired by the Summit County Sheriff's Office as a Deputy Sheriff on or about February 16, 1999.

31.    Plaintiff consistently performed well at his job and repeatedly exceeded expectations on performance evaluations.

32.    On or about August 31, 2007, Plaintiff was promoted to the rank of Sergeant.

33.    In 2009, Plaintiff was forced to file a complaint with the Equal Employment Opportunity Commission ("EEOC") against his supervisor, who was repeatedly denying Plaintiff's training requests for no stated reason, while approving identical requests made by white deputies.

34.    In 2010, Defendant Kline was captured on video using excessive and unreasonable force against a detainee in the Summit County Jail, throwing the detainee against a wall and beating him. Defendant Kline received a "write-up," or reprimand, for this conduct. Plaintiff was the supervisor tasked with personally serving Defendant Kline with this disciplinary write-up at Defendant Kline's home.

35.    In 2014, there were only four African American deputies in supervisory roles in the entire SCSO – one Lieutenant and three Sergeants. There were no African American deputies in coveted, full-time specialty assignments, such as narcotics, community services, or internal affairs. Plaintiff was the only African American deputy assigned to patrol. Most African American deputies were assigned to work in the County's jail facilities.

36.    In 2014, Plaintiff initiated a meeting with the three other African American SCSO supervisors to discuss ways to encourage the department to hire and promote more African Americans and other minorities, so that SCSO would be more representative of the people of Summit County.

37.    Plaintiff then enlisted the involvement of an attorney to inquire about the racial composition of SCSO. The inquiry revealed that the Sheriff's Office was almost all white, with very few African Americans in supervisory roles or specialty assignments.

38.    Shortly after that inquiry, on December 5, 2014, Plaintiff was selected for promotion to Lieutenant, at least in part because of his race as an African American.

39.    The Lieutenant promotions, scheduled for December 16, 2014, included Plaintiff, a white male deputy, and a white female deputy. Out of the three deputies scheduled for promotion that day, Plaintiff had served with SCSO the longest, and would therefore have had seniority over his two fellow white deputies in terms of internal rank and scheduling assignments/opportunities once they were Lieutenants.

40.    The scheduled promotions were then rescinded on the basis of Plaintiff's race, so that Plaintiff would not gain seniority over the white male deputy.

41.     The three promotions were reissued on or about January 12, 2015, but they were no longer scheduled to occur on the same day.

42.     Rather, the white male deputy was promoted one day prior to Plaintiff, so that he would obtain seniority over Plaintiff once they both achieved the same rank, despite the white deputy having worked for SCSO for a shorter period of time than had Plaintiff.

43.     On or about January 21, 2015, Plaintiff was promoted to the rank of Lieutenant.

44.     In 2016, the Akron NAACP pressured Defendant Barry to employ more African Americans on the SCSO's fourth-floor command group. The NAACP complained about the disproportionate lack of African Americans in leadership roles at SCSO compared to the community's composition of African Americans.

45.     As a result of this pressure, and in part because Plaintiff was African American, Plaintiff was selected for assignment in Internal Affairs by Defendant Barry in November of 2016.

46.     Plaintiff's direct supervisor in Internal Affairs, Defendant Rhoades, told Plaintiff that he did not want Plaintiff in Internal Affairs and would not have selected Plaintiff for assignment in Internal Affairs but for Defendant Barry's insistence.

47.     Defendant Rhoades did not like Plaintiff, and made disparaging comments about African Americans in front of Plaintiff. For example, Defendant Rhoades made it a point to tell Plaintiff that the first African Americans Defendant Rhoades had ever spoken to were inmates in the Summit County Jail.

48. As Judge Rowlands found in her February 24, 2021 Order dismissing the OHLEG misuse-related criminal charges against Plaintiff on the basis of unconstitutional selective prosecution, "Race was admittedly a factor in [Plaintiff's] promotion."

**The Night of March 18, 2017**

49. At the start of 2017, Plaintiff was working in Internal Affairs investigating allegations of misconduct against other deputies in SCSO, having entered that position in or about November 2016.

50. On the night of March 18, 2017, Plaintiff was 46 years old, and had been with SCSO for eighteen years. Plaintiff had never had a single citizen complaint substantiated against him.

51. While working Internal Affairs, Plaintiff was assigned an unmarked detective bureau vehicle – a light blue Chevy Malibu.

52. The Malibu was a "take-home" vehicle that Plaintiff drove home each night after work. Plaintiff was also permitted to use the Malibu while working secondary employment jobs approved by SCSO.

53. This unmarked Chevy Malibu did not have red and blue overhead lights; it did not have "Sheriff" emblazoned on the side; it did not contain an onboard computer system, keyboard, or mobile data terminal ("MDT"); its rear doors opened from the inside like any other sedan; and it had soft back seats, not hard plastic seats like a marked SCSO cruiser.

54. On the evening of March 18, 2017, Plaintiff was working approved secondary employment providing security at the Woods apartment complex on Romig Road in southwest Akron.

55.     That night, Plaintiff drove his unmarked blue Chevy Malibu to his secondary employment detail at the Woods apartment complex. As was requested by the Woods apartment owners, and having been previously approved, Plaintiff was wearing his Sheriff's uniform but was not wearing a hat. He was clean-shaven and has never worn facial hair.

56.     From sometime after 10 p.m. on March 18, 2017, until a little after 2:30 a.m. on March 19, 2017, Plaintiff sat in his unmarked car in the Woods complex parking lot watching the property.

57.     At around 11:45 p.m. on March 18, 2017, Plaintiff's fiancée visited him at the Woods complex and brought him a spaghetti dinner with garlic bread. She parked next to Plaintiff in his unmarked Chevy Malibu and handed him the food. They talked for some time, and then she left. She later testified to this in a sworn affidavit.

58.     At approximately 2:30 a.m. on March 19, 2017, a 26-year-old woman named Moriah Asefi walked by the Woods apartments yelling loudly at someone on her phone.

59.     From inside his unmarked car, Plaintiff made contact with Asefi and asked her to be more quiet, as people in the nearby apartments were sleeping.

60.     Plaintiff asked Asefi if she was all right. Asefi said she was from out of town and was looking for a place to stay. She asked Plaintiff if there were any hotels around.

61.     Plaintiff searched his phone for nearby hotels, and at 2:33 a.m., called one for Asefi to check the rates and vacancy. Asefi thanked him, and walked away.

62.     Plaintiff remained in his vehicle during the entire interaction with Asefi.

63.     At no point did Asefi enter Plaintiff's vehicle.

12

**Asefi's Allegations**

64.     On March 19 and 20, 2017, Asefi reported to Akron Police that she had been forced to give a black male Summit County Sheriff's Deputy oral sex in the early morning hours of March 19th in the front seat of a marked SCSO cruiser.

65.     Asefi reported her claims to Akron City Police, and ultimately to Defendants McMillan and Forney, who recorded interviews with Asefi and who were responsible for investigating her allegations.

66.     Defendants McMillan and Forney obtained cell phone call records, text message records, and cell tower data for Asefi's cell phone.

67.     Asefi described her alleged assailant to Defendants McMillan and Forney as follows:

a)     Five feet, five inches tall;

b)     Between 30 and 37 years old;

c)     "Really, really light" colored eyes, possibly "green," as she told her mother;

d)     Facial hair;

e)     Deep voice;

f)     Wearing a hat the entire time;

g)     Driving a marked, black and yellow Sheriff's cruiser, equipped with overhead emergency lights and an onboard computer and keyboard.

68.     By March 20, 2017, a day after the alleged rape, in response to their inquiry about the SCSO deputy described by Asefi, Defendant Kline offered up Plaintiff by name

and suggested to Defendants McMillan and Forney that Plaintiff should be suspected, despite the fact that Plaintiff did not match Asefi's description, aside from being black.

69.     Defendants McMillan and Forney then obtained cell phone call records and cell tower data for Plaintiff's cell phone.

70.     Asefi sent and received many text messages throughout the time at issue on the morning of March 19, 2017.

71.     Asefi told law enforcement, including Defendants McMillan and Forney, that her alleged assailant gave her a ride in the back of his marked, black and yellow Summit County Sheriff's cruiser, equipped with emergency lights, a computer terminal, and emblazoned with "Sheriff" on the side.

72.     Asefi claimed that at one point, she told her alleged assailant she had to vomit, and so she claimed he pulled the cruiser over.

73.     According to Asefi, the alleged assailant had to exit the vehicle to open the rear door for her, as the rear door on the Sheriff's cruiser did not open from the inside.

74.     Asefi claimed she leaned out of the cruiser and vomited for several minutes. She said she believed that she got some vomit in and on the cruiser.

75.     Asefi then claimed that her assailant pulled her out of the marked cruiser, searched her, groped her breasts, and put her in the front seat of the cruiser. She said her assailant then got into the driver's seat.

76.     At that point, Asefi alleged the assailant pushed her head into his lap and forced her to perform oral sex while the cruiser was still parked.

77.     Asefi disclosed to Defendants McMillan and Forney that she works as a prostitute/escort, and is she is admittedly familiar with male anatomy and the appearance of a circumcised as compared to an uncircumcised penis.

78.     Asefi told Defendants McMillan and Forney her assailant "was not circumcised." She said this twice during an interview recorded by Defendants McMillan and/or Forney.

79.     Asefi was very specific in her allegation that her assailant repeatedly told her not to touch the cruiser's onboard computer while she was leaning over to perform oral sex on him from the passenger seat. She claimed the keyboard lit up green.

80.     Asefi claimed her assailant ejaculated inside the cruiser.

81.     She claimed that she had her assailant's DNA on her body and in her mouth.

82.     Asefi claimed her assailant drove her to the IHop restaurant on Arlington Road in Akron, where he dropped her off.

83.     Asefi claimed her assailant said he was from Canton and that he was heading back there that night.

84.     Asefi presented to the hospital, after sleeping at a hotel, the next morning after the alleged assault. A rape kit was performed, and DNA swabs were taken of Asefi's mouth, breasts, and other areas.

**The Evidence Excluded Plaintiff As A Suspect and There Was No Probable Cause to Suspect Plaintiff**

85.     The evidence gathered by Defendants McMillan and Forney excluded Plaintiff as a suspect for the crimes alleged by Asefi. The evidence did not support a probable cause finding to initiate, pursue, or cause to be pursued, any criminal charges against Mr. Williamson for Asefi's alleged sexual assault. It was objectively unreasonable

to believe probable cause existed to arrest Plaintiff in relation to Asefi's allegations, or that Plaintiff was or could be guilty of or otherwise lawfully charged with the crimes alleged by Asefi.

86.     The identifiable male DNA sample obtained from Ms. Asefi's body conclusively excluded Plaintiff as the donor. None of Plaintiff's DNA was found anywhere on or in Asefi's body.

87.      Plaintiff did not match the description provided to Defendants McMillan and Forney by Asefi:

a)      At five feet, nine inches Plaintiff is significantly taller than Asefi's alleged assailant (5' 5");

b)      Plaintiff was 46 years of age, not in his early-to-mid thirties as was the alleged assailant described by Asefi;

c)      Plaintiff has dark brown eyes, not "really, really light" colored eyes or "green" eyes as was the alleged assailant described by Asefi;

d)      Contrary to Asefi's description of the alleged assailant, Plaintiff is clean-shaven and does not have facial hair;

e)      Unlike the alleged assailant described by Asefi, Plaintiff does not have a deep voice;

f)      Unlike the alleged assailant described by Asefi, Plaintiff does not have "very rough" hands, as Defendants McMillan and Forney knew upon shaking Plaintiff's hand during their initial interview;

g)      Asefi claimed her assailant wore his hat the entire time. Plaintiff was not wearing his hat inside his vehicle;

h)  Asefi gave detailed descriptions of the inside and outside of the marked cruiser she was in when she was allegedly assaulted. Plaintiff was not driving a marked cruiser on the night in question; and

i)  Asefi confirmed – twice – that her assailant was not circumcised. Plaintiff, however, is circumcised, a fact about which Defendants McMillan and Forney were aware at the time of their initial interview with Plaintiff, during which they made Plaintiff expose his genitals to them for photographing.

88.  During an April 12, 2017 interview with Plaintiff, Defendants McMillan and Forney forced Plaintiff to expose his genitalia and be photographed. Defendants McMillan and Forney were able to quickly confirm that, contrary to Asefi's allegations, Plaintiff is unquestionably circumcised.

89.  Plaintiff's unmarked Chevy Malibu is not mistakeable for the marked Sheriff's cruiser inside of which Asefi alleged she was assaulted:

a)  Plaintiff's vehicle was light blue, not black and yellow;

b)  Plaintiff's vehicle did not have "Sheriff" emblazoned on the sides, or anywhere;

c)  Plaintiff's vehicle did not have red and blue overhead emergency lights;

d)  Plaintiff's vehicle did not have an onboard computer, MDT or keyboard;

e)  The rear doors of Plaintiff's vehicle open from the inside, contrary to Asefi's description of the cruiser in which she was assaulted whereby her alleged assailant had to open the rear door for her so she could vomit; and

f)  The rear seats of Plaintiff's vehicle are soft cloth, not hard plastic like in a marked Sheriff's cruiser and as described to Defendants McMillan and Forney by Asefi.

90.  MDT keyboards used by in SCSO cruisers light up red, not green, as Asefi claimed to Defendants McMillan and Forney.

91.  Plaintiff's fiancée at the time confirmed under oath that she saw Plaintiff at the Woods apartment complex on Romig Road in his unmarked, blue Chevy Malibu on the night Asefi claimed to Defendants McMillan and Forney that she was assaulted in a marked SCSO cruiser. Plaintiff's fiancée further confirmed that Plaintiff was not wearing his hat when she saw him.

92.  All Summit County Sheriff's deputies must "call out" on the radio to identify themselves whenever they drive a marked Sheriff's cruiser, including when working secondary employment. The pertinent SCSO radio logs contain no evidence that Plaintiff drove a marked cruiser on the night Asefi claims she was assaulted.

93.  There is no electronic data or evidence from any SCSO cruiser's MDT computer that indicates Plaintiff was driving a marked cruiser on the night Asefi claims she was assaulted, in the areas Asefi claims she was assaulted.

94.  There is no written record, employment record, or video evidence that Plaintiff ever obtained a marked Sheriff's cruiser on March 18, 2017.

95.    None of Asefi's DNA or vomit was found in any marked SCSO cruiser.

96.    None of Asefi's DNA or vomit was found in Plaintiff's unmarked Chevy Malibu.

97.    No cell phone tower data places Plaintiff in the vicinity of Arlington Road, in the area where Asefi claimed to Defendants McMillan and Forney that she was dropped off at an IHop restaurant by her alleged assailant, on the morning of March 19, 2017, when Asefi claims she was assaulted.

98.    No video evidence places Plaintiff in the vicinity of Arlington Road on the morning of March 19, 2017, when Asefi claims she was assaulted.

99.    Defendants McMillan and Forney were in possession and aware of the content of Asefi's text messages and/or recklessly ignored them. The record of Asefi's text messages before, during and after her alleged assault contradict, in numerous ways, what she reported to Defendants McMillan and Forney, including, but not limited to:

        a)    From approximately 1:00 a.m. until 5:53 a.m. on the morning of March 19, 2017, Asefi continuously sends text messages, such that there would be no time for her to vomit for several minutes, get searched by her assailant, groped, and forced to perform oral sex to completion. There is simply no time in between text messages she sends for this to occur;

        b)    In her text messages during the time at issue, Asefi repeatedly sends messages saying she is "walking" down the street during the same time she tells Defendants McMillan and Forney that she is in the back

of a marked cruiser and later being assaulted in the front seat of a
marked SCSO cruiser;

c)    In her text messages, Asefi repeatedly lies to her alleged boyfriend about where she is, in conflict with video surveillance footage obtained by Defendants McMillan and Forney;

d)    Asefi admits in text messages, after meeting with Akron police, that she could not accurately identify her alleged assailant; and

e)    In text messages, Asefi claimed she was put in handcuffs while forced to perform oral sex, however she never told Defendants McMillan and Forney that she was handcuffed, and she later testified under oath that she was *never* handcuffed.

100.    Security camera footage contradicts Asefi's allegations and statements to Defendants McMillan and Forney:

a)    Contrary to her claims, there is no video evidence that Asefi was dropped off at IHop by a Sheriff's deputy driving a marked cruiser;

b)    The only car visible on security camera footage reviewed by Defendants McMillan and Forney from outside of IHop was driving an entirely different direction than Asefi claimed, and no person is seen exiting the vehicle;

c)    Immediately after Asefi claims she was sexually assaulted and distraught, Asefi is seen on camera inside IHop laughing, joking, and eating a full meal with five males; and

d)     Asefi claimed to Defendants McMillan and Forney that she was too distraught to eat at the IHop, but the restaurant's surveillance video, in Defendants McMillan and Forney's possession, clearly depicts Asefi eating an entire plate of food, taking more than 20 bites with her fork.

101.    Ms. Asefi never identified her assailant by name prior to being shown a "6 pack" photo lineup by Defendants McMillan and Forney that included Plaintiff.

102.    Plaintiff has never sexually assaulted anyone. No one has ever accused or suspected Plaintiff of sexual assault. Defendants McMillan and Forney had no evidence or reason to believe that Plaintiff had any history of or predilection toward sexual assault.

103.    Asefi reported on social media that she was going to get money as a result of her allegations against Plaintiff.

104.    Plaintiff denied he ever sexually assaulted anyone and was truthful and forthright with Defendants McMillan and Forney.

105.    Considering all of the evidence set forth above, no reasonable person would believe that Plaintiff committed or could have committed the crimes alleged by Asefi.

106.    At no time did the evidence revealed during Defendants McMillan and Forney's investigation rise to a level to support any probable cause finding that Plaintiff did or even could have committed the crimes alleged by Asefi.

107.    Furthermore, no reasonable person would believe that probable cause existed to suspect, arrest, prosecute, or charge Plaintiff with any crimes in relation to the allegations made by Asefi, or otherwise initiate, cause or contribute to any criminal prosecution against Plaintiff.

**Defendants McMillan And Forney Made False And Misleading Statements, And Knowingly And/Or Recklessly Omitted Critical Information And Facts, In Their Written Reports And Affidavits To Initiate And Further A Criminal Prosecution Against Plaintiff**

108.    In response to their inquiry about a black Deputy who, according to Asefi, was wearing a hat, the Summit County Sheriff's Office, through Defendant Kline, instructed Defendants City of Akron, McMillan, and Forney to investigate Plaintiff specifically.

109.    Defendants McMillan and Forney undertook no investigation to discover or otherwise investigate anyone other than Plaintiff.

110.    Despite not matching the physical description of Asefi's alleged assailant, Defendants Kline, Barry, and Rhoades all suggested to Defendants McMillan and Forney that they should investigate Plaintiff because Asefi said her assailant was black and wore a hat.

111.    Defendants Kline, Barry, and Rhoades assisted Defendants McMillan and Forney in initiating a prosecution of Plaintiff despite knowing that no probable cause existed to do so.

112.    Defendants Kline, Barry, and Rhoades aided and abetted Defendants McMillan and Forney in making false and misleading statements, and omitting critical information, in their written reports and sworn affidavits.

113.    Defendants McMillan and Forney did not explore any other suspects and willfully and intentionally ignored other suspects who better matched Asefi's description.

114.    On information and belief, Defendants McMillan and Forney jointly wrote, reviewed, and approved the Akron Police Department reports and other documents created in relation to the investigation into Plaintiff over Asefi's allegations. On further

information and belief, the statements contained in the reports were adopted by both Defendants McMillan and Forney.

115.    In their written reports, Defendants McMillan and Forney made multiple intentionally false and misleading statements, all of which served to prejudice Plaintiff, were designed to falsely infer his guilt in relation to Asefi's allegations, and initiate and further Plaintiff's unlawful arrest, detention and criminal prosecution.

116.    Defendants McMillan and Forney also intentionally omitted critical material facts and information in the reports, documents and affidavits, which, had they been included, would have served to both discredit Asefi and conclusively exonerate Plaintiff.

117.    Defendants McMillan and Forney made the following non-exhaustive list of intentionally false and misleading statements in their written reports, documents and/or affidavits, all of which proximately caused or contributed to Plaintiff's unlawful arrest and prosecution:

 a)     Defendants McMillan and Forney falsely stated that a call from Plaintiff's cell phone "pinged" off of a cell tower on Arlington Road at 3:15 a.m. on March 19, 2017. This is not true, and this false statement served to attempt to corroborate Asefi's claim that Plaintiff drove her in a marked cruiser to the IHop on Arlington Road around that time. No such call was ever made, no such ping ever existed, and no record of such a call or ping ever existed;

 b)     Defendants McMillan and Forney falsely stated in their written report that Asefi "wasn't sure" whether her assailant's penis was circumcised or not, but that there was "a lot of skin on it." This false

statement served as an attempt to better match Asefi's description to the Plaintiff, who is circumcised. However, in her recorded interview with Defendants McMillan and Forney, Asefi clearly and firmly stated, *twice*, that her assailant "was not circumcised." She added "there was *way* too much skin."

c) Defendant McMillan falsely swore in an affidavit dated April 11, 2017, that Asefi stated "the suspect's penis appeared to have 'a lot of skin,' suggesting he was uncircumcised." This is false, as described above;

d) Defendant McMillan further falsely swore in the April 11, 2017 affidavit, that "during a review of employment records he was able to confirm that [Plaintiff] worked an extra job (though in uniform and driving a marked patrol cruiser) in the area of 2500 Romig Road at the time of the incident…" This statement is false, as no employment records exist that confirm or even suggest that Plaintiff was driving a marked patrol cruiser at his extra job around the time of the incident;

e) Defendants McMillan and Forney falsely stated in their written report that from the security camera footage at the Walmart on Arlington Road "[they] were able to observe a sheriff's marked cruiser drive in the far end of the Walmart lot and do a U turn behind the IHop restaurant." This statement is false; due to the poor quality of the video, it is impossible to discern any details whatsoever of the vehicle seen there. Only headlights and taillights are visible;

f)  Defendant McMillan further falsely swore in an April 11, 2017 affidavit, that "during a review of the surveillance video for the Walmart located on Arlington Road in Springfield Township investigators were able to corroborate that Asefi was dropped off at approximately 0330. It appears from the video that she was dropped off by a vehicle with law enforcement emblems." This statement is false, as the security camera footage from Walmart shows a vehicle pull through at 3:14 a.m., not 3:30; no people get out of the vehicle; and it is impossible to discern any features of the vehicle, let alone "law enforcement emblems" due to the profoundly poor quality of the video;

g)  Defendants McMillan and Forney falsely stated that "how [Plaintiff] exposed himself" during their interview with Plaintiff was "similar to the statement made by the victim." This false statement served as an effort to corroborate Asefi's allegations. However, Asefi was clear in her recorded interview with McMillan and Forney that she did not see "how" her assailant exposed himself – his penis was allegedly "already out" by the time she noticed it;

h)  Defendants McMillan and Forney also falsely stated in their report that the "photos of [Plaintiff's] penis were similar to [Asefi's] description in her interview." This false statement served to corroborate Asefi's allegations. However, Plaintiff is obviously

25

circumcised, and his penis looks nothing like an uncircumcised penis.

118.    Defendants McMillan and Forney intentionally and/or recklessly made the following non-exhaustive list of material factual omissions from their written reports, documents and/or affidavits:

a)    Asefi claimed her assailant was from Canton, Ohio. In her recorded interview, Asefi said, "He said he was from Canton." She also said her assailant stated he was over in this part of town because he just finished dropping someone off.  Then, according to Asefi, her assailant stated that he had to get back to Canton. However, Plaintiff lived in Warrensville Heights, not Canton. Plaintiff was not in that part of town because he was dropping someone off; he was working. Defendants omitted this critical information;

b)    Asefi stated her alleged assailant took Killian Road to get to the IHop, not Interstate 77, which would have required the marked cruiser in which she alleged she was assaulted to have been traveling south on Arlington Road to get to IHop. This fact conflicted with security camera footage that Defendants McMillan and Forney claimed showed the assailant's marked cruiser traveling north on Arlington Road. Defendants McMillan and Forney excluded this critical information in an effort to capitalize on video they did retrieve showing a marked cruiser drive by – in the opposite direction it would have been driving according to Asefi's story;

c)     Asefi claimed her assailant was between 30 and 37 years old. Plaintiff was 46 at the time of the alleged assault. Yet Defendants McMillan and Forney excluded Asefi's description of her assailant's age from their reports;

d)     During Plaintiff's initial interview with Defendants McMillan and Forney, Plaintiff stated that he was not wearing his hat at all while in his vehicle. Asefi claimed her alleged assailant kept his hat on the entire time. Defendants McMillan and Forney left this out of their reports; and

e)     Defendants McMillan and Forney intentionally and/or recklessly omitted the other numerous discrepancies concerning Asefi's account and descriptions as set forth herein above.

119.   Defendants McMillan and Forney made these false statements and material omissions unreasonably, recklessly and/or with malice and in order to unlawfully initiate a criminal investigation against Plaintiff.

120.   Through their investigation of Plaintiff, Defendants McMillan and Forney not only demonstrated a general animus toward Plaintiff, but a racial animus. For example, Defendant McMillan asked Asefi whether her assailant talked "black," or whether he talked "educated."

121.   The reports, affidavits and information completed and provided by Defendants McMillan and Forney caused and contributed to Plaintiff being subjected to arrest and criminal prosecution. Defendants McMillan and Forney's reports, affidavits,

27

and information initiated and served to support the initiation and furtherance of Plaintiff's criminal prosecution.

122.    On information and belief, the Summit County Prosecutor's Office relied on these reports and affidavits when deciding whether to seek an indictment of Plaintiff in relation to Asefi's allegations, and further relied on them when determining how to present Plaintiff's case for indictment, and ultimately whether to initiate, pursue and to continue to pursue criminal charges against Plaintiff.

123.    On information and belief, Defendants Kline, Barry, and Rhoades were aware of the false statements and material omissions made by Defendants McMillan and Forney in their written reports and affidavits, including that prosecutors had relied on those false and misleading statements in deciding to seek an indictment of Plaintiff and in determining how to present the case for indictment, and deliberately took no action to correct those false statements.

124.    On further information and belief, had Defendants McMillan and Forney not made false and misleading statements, and included all material facts in their reports and affidavits, the investigation of Plaintiff, Plaintiff would have been rightfully excluded as a suspect, would not have been referred for prosecution, and further, the Summit County Prosecutor's Office would not have chosen to seek to indict or to otherwise prosecute or continue to prosecute Plaintiff.

125.    On further information and belief, had Defendants Kline, Barry, and Rhoades corrected the false statements and material omissions made by Defendants McMillan and Forney and otherwise performed a reasonable and fair investigation, Plaintiff would have rightfully been eliminated as a suspect, the investigation of Plaintiff

would not have been referred for prosecution, and further, the Summit County Prosecutor's Office would not have chosen to seek to indict or to otherwise prosecute or continue to prosecute Plaintiff.

126.  Based upon Defendant McMillan and Forney's false statements and material omissions, Plaintiff was charged, arrested, indicted and prosecuted for rape, kidnapping, sexual battery, and gross sexual imposition.

<u>**Plaintiff's Arrest, Trial, and Acquittal**</u>

127.  Plaintiff turned himself in to the authorities and was arrested without probable cause on or about July 20, 2017.

128.  Plaintiff spent approximately one day in jail.

129.  On July 21, 2017, Plaintiff was released after posting a $100,000 bond.

130.  Plaintiff spent 30 days on house arrest. Then, Plaintiff was forced to wear an ankle monitor for about one year, during which time he was under supervision and forced to report to authorities on a weekly basis.

131.  Plaintiff was forced to hire attorneys to defend himself against the serious crimes alleged against him.

132.  Shortly before trial on the sexual assault-related charges, the Summit County Prosecutor's Office dismissed the rape and kidnapping counts against Plaintiff.

Despite Defendants City of Akron, McMillan, and Forney's false statements, material omissions, and malicious prosecution of Plaintiff in violation of the Constitution and the laws of the State of Ohio, Plaintiff was unanimously acquitted by the jury of all remaining sexual assault-related counts.

## The Wrongful Termination Of Plaintiff Based On Race

133.    During the City of Akron's investigation of Plaintiff, Defendants McMillan and Forney discovered that Plaintiff had used the Ohio Law Enforcement Gateway ("OHLEG") system to search his own name or license plate on several occasions over the course of many years, a typical and widespread practice during that time at SCSO.

134.    Defendants City of Akron, McMillan, and Forney referred this information to the Defendant Summit County Sheriff, including Defendant Barry and Defendant Kline, for investigation, which they undertook.

135.    On January 2, 2018, Plaintiff was supplementally indicted with ten counts of OHLEG violations, occurring from January 2014 through March 2017.

136.    The SCSO requires a legitimate law enforcement purpose for each use of the OHLEG system.

137.    Each and every self-search Plaintiff performed on OHLEG had a legitimate law enforcement purpose and was allowed and authorized by his supervisors.

138.    Plaintiff's self-searches in OHLEG were performed at the direction of his supervisors in conjunction with his performance reviews and for the purpose of training younger deputies.

139.    During SCSO's OHLEG investigation into Plaintiff, Plaintiff was under indictment for rape, kidnapping, sexual battery, and gross sexual imposition, and OHLEG misuse crimes, and was therefore advised by his attorney against making any statements to investigators to protect his Fifth Amendment rights against self-incrimination.

140.  On April 16, 2018, after Plaintiff's OHLEG case was referred for prosecution, the SCSO conducted a pre-termination administrative hearing regarding Plaintiff's OHLEG self-searches.

141.  SCSO refused to delay the hearing until after the resolution of the criminal matters against Plaintiff. Because of this, Plaintiff was unable to fully participate in the hearing and personally offer explanations regarding the circumstances surrounding his self-searches in OHLEG to protect his Fifth Amendment right against self-incrimination.

142.  During the April 16 hearing, Sgt. Christopher Plance admitted that it was appropriate for deputies to perform self-searches during initial OHLEG training sessions. He testified he was "not sure" how deputies practiced in OHLEG following their initial training. Additionally, Sgt. Plance avoided answering whether he was aware of other deputies performing self-searches in OHLEG, instead stating "there have been OHLEG violations."

143.  A union representative spoke on Plaintiff's behalf and explained that each self-search was for a legitimate law enforcement purpose. Plaintiff performed the self-searches in connection with performance reviews at the direction of his supervisors and while training younger deputies in how to use OHLEG.

144.  Defendant Kline, who bore animus toward Plaintiff due to Plaintiff's race and Plaintiff's prior service of a disciplinary write-up on Defendant Kline, was responsible for conducting the investigation into Plaintiff's alleged OHLEG violations.

145.  Defendant Kline, who is white, has previously used OHLEG to search other deputies' names. He was never referred for criminal prosecution for these uses and received no administrative discipline or adverse action.

146. Defendant Rhoades, who also bore animus toward Plaintiff due to Plaintiff's race, also assisted, aided, and abetted both the sexual assault and OHLEG-related investigations into Plaintiff. On information and belief, Defendant Rhoades actively encouraged Plaintiff's termination from employment with SCSO.

147. Prior to and including 2018, it was common practice at the SCSO for supervisors to require deputies to perform OHLEG searches on themselves in preparation for annual reviews.

148. Despite this, Defendant Kline claimed he was "unable to fathom any possible law enforcement reasons" for Plaintiff's self-searches. Making this claim even more incredible is that Defendant Kline admitted under oath he has performed numerous OHLEG searches other than for purposes of obtaining information on a criminal suspect.

149. Defendant Barry encouraged, aided, and abetted the disparate treatment of Plaintiff based upon Plaintiff's race.

150. Defendant Rhoades, Plaintiff's supervisor in Internal Affairs, encouraged, aided, and abetted the disparate treatment of Plaintiff based on race by encouraging his termination.

151. Defendants Kline, Rhoades, and Barry deliberately chose not to further investigate Plaintiff's assertions, through his union representative, that his OHLEG self-searches were for the purposes of performance evaluations and deputy training.

152. Shortly after Plaintiff's indictment for alleged OHLEG violations, the Ohio Attorney General's Office ("OAG") became aware of many "bad practices" in the SCSO with regard to OHLEG use, and told the Sheriff's office it "was clear that… the Summit

County Sheriff's Office… did not understand that running oneself through OHLEG was a violation of [the] rules and regulations."

153.    The OAG then revoked all Summit County Sheriff's deputies' OHLEG privileges and made them go through OHLEG recertification as a result.

154.    Prior to 2018, it was a widespread practice within the SCSO for deputies to conduct self-searches on OHLEG, for numerous authorized reasons.

155.    At the time of Plaintiff's termination, it was largely unknown within the SCSO that deputy self-searches on OHLEG were actually a violation of OAG rules and regulations.

156.    Following Plaintiff's supplemental ten-count indictment for OHLEG-related criminal violations, the Defendant Summit County Sheriff, aided and abetted by Defendants Barry and Rhoades, terminated Plaintiff's employment on or about April 19, 2018, citing his alleged OHLEG violations as the reason.

157.    The Defendant Summit County Sheriff's deliberate decision to terminate Plaintiff's employment for the same violations committed by white deputies, whose employment was not terminated, is invidious conduct based on Plaintiff's race.

158.    Defendants SCSO and Barry's purported basis for terminating Plaintiff, which they stated was based solely on the alleged OHLEG violations and not on the pending sexual assault charges or Plaintiff's race/protected status, is a pretext, when in fact Plaintiff's termination and treatment by SCSO and Defendants Barry, Kline and Rhoades was motivated by racial animus.

159.    On May 1, 2023, Judge Rowlands granted the Summit County prosecutor's Motion to Dismiss the charges against Plaintiff with prejudice. Summit County's voluntary

dismissal with prejudice of the charges against Plaintiff is further evidence that the Summit County Sheriff's termination of Plaintiff's employment was unlawful, pretextual, and discriminatory. Plaintiff had committed no crimes and only used OHLEG in the same manner as his white colleagues, who were not terminated.

## **FIRST CLAIM FOR RELIEF**

### **(Violation of 42 U.S.C. § 1983 Against Defendants McMillan, Forney, Kline, Barry, and Rhoades for False Arrest and Malicious Prosecution in Violation of the Fourth Amendment)**

160.   Plaintiff repeats and realleges each and every allegation set forth in each and every preceding paragraph as if fully rewritten herein.

161.   Defendants McMillan and Forney made, influenced, and/or participated in the decision to prosecute Plaintiff without probable cause by, among other things, writing materially false, incomplete, and misleading incident reports and sworn affidavits related to the subject incident, all of which resulted in Plaintiff's unlawful arrest and prosecution.

162.   Defendants Kline, Barry, and Rhoades assisted Defendants McMillan and Forney in initiating a prosecution of Plaintiff despite knowing that no probable cause existed to do so.

163.   Defendants Kline, Barry, and Rhoades aided and abetted Defendants McMillan and Forney in making false and misleading statements, and omitting critical information, in their written reports and sworn affidavits.

164.   Said Defendants' involvement in making, influencing, and participating in the criminal case against Plaintiff without probable cause caused him to be charged, arrested, and indicted on charges of rape, kidnapping, sexual battery, and gross sexual

imposition, jailed, supervised, and forced to defend himself against serious criminal charges.

165. The initiation and perpetuation of criminal charges against Plaintiff were unlawful and without justification or probable cause.

166. The initiation and perpetuation of these criminal charges against Plaintiff by Defendants resulted in a significant deprivation of Plaintiff's liberty, separate and apart from his initial arrest and required bond.

167. All criminal charges brought against Plaintiff stemming from the investigation for which Defendants McMillan and Forney were responsible were resolved in Plaintiff's favor. The charges of rape and kidnapping were dismissed by the Summit County Prosecutor's Office, and Plaintiff was unanimously acquitted by the jury on all remaining sexual assault-related charges.

168. As a direct and proximate result of Defendants' conduct described herein, Plaintiff was charged, arrested, confined, and incurred fees and costs associated with his legal defense in the criminal case these Defendants caused to be initiated and allowed to persist, suffered severe mental and emotional distress, and suffered other general and special economic and non-economic damages in amounts to be proven at trial.

169. At all times relevant, Defendants McMillan, Forney, Kline, Barry, and Rhoades were acting under color of law and within the scope of their employment and official duties as law enforcement officers employed by the City of Akron and the SCSO. Accordingly, pursuant to Ohio Revised Code § 2744.07, Defendant City of Akron must indemnify Defendants McMillan and Forney, and Defendant SCSO must indemnify

Defendants Kline, Barry, and Rhoades for their conduct alleged herein in this Claim for Relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants McMillan, Forney, Kline, Barry, and Rhoades, jointly and severally, for:

a.  Compensatory damages, including legal fees and costs, in an amount that will fully and fairly compensate Plaintiff for the harms and losses he suffered, including emotional injuries and defamation to his reputation;

b.  Punitive damages in an amount that will serve to adequately punish and deter the acts and omissions of Defendants McMillan and Forney alleged herein;

c.  Costs of suit and reasonable attorneys' fees and interest, both pre-judgment and post-judgment; and

d.  All such other relief to which the Plaintiff is entitled and/or the Court deems equitable.

## SECOND CLAIM FOR RELIEF

### (Violation of 42 U.S.C. § 1983 Against Defendant City of Akron for Failure to Train and Supervise and for Unconstitutional Customs, Policies, and Practices Causing Constitutional Violations)

170.    Plaintiff repeats and realleges each and every allegation set forth in each and every preceding paragraph as if fully rewritten herein.

171.    On information and belief, City of Akron police officers have a known and documented history of violating citizens' constitutional rights, including repeated wrongful and maliciously initiated prosecutions based upon false or misleading information or by omitting critical material facts from their investigative reports and affidavits, about which the City of Akron was aware, to which, however, it was and is deliberately indifferent.

172.    On information and belief, Defendant City of Akron has a pattern and practice of failing to adequately and properly train, supervise, investigate, and

punish/reprimand its police officers on the usually and known recurring circumstances likely to be faced by the officers, including, but not limited to, the inclusion of false and misleading statements in reports and affidavits, or the omission of material facts, in order to initiate prosecution of certain individuals.

173.     On information and belief, Defendant City of Akron promulgated and implemented and/or otherwise condoned and tolerated customs and policies, written and unwritten, for hiring, training, retention, and supervision and investigation of Akron police officers on the inclusion of false and misleading statements in reports and affidavits, or the omission of material facts, in order to initiate prosecution of certain individuals that, on their face, violate the Fourth Amendment.

174.     On information and belief, Defendant City of Akron ratified the unconstitutional conduct of Defendants McMillan and Forney against Plaintiff, as is its policy, practice, and/or custom, which thus signals to its police officers that they can engage in unconstitutional seizures and prosecutions with impunity.

175.     As a direct and proximate result of the customs and policies described herein, which violate the Fourth Amendment and are otherwise implemented in a manner such that constitutional violations are substantially certain and likely to occur, Plaintiff's Fourth Amendment rights were violated and he was forced to suffer and endure extreme deprivations of his liberty, a wrongful prosecution, mental and emotional pain and suffering, pecuniary loss, and legal fees and costs.

**WHEREFORE,** Plaintiff prays for judgment against Defendant City of Akron for:

a. Compensatory damages, including legal fees and costs, in an amount that will fully and fairly compensate Plaintiff for the damages and losses he suffered;

b. Costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and interest, both pre-judgement and post-judgment; and

c. All such other relief to which Plaintiff is entitled and/or this Court deems equitable.

**THIRD CLAIM FOR RELIEF**

**(Unlawful Discriminatory Practices in Violation of R.C. § 4112.02(A), (I) And (J) Against Defendants Summit County Sheriff Fatheree In Her Official Capacity, Barry, Kline, and Rhoades)**

176.    Plaintiff repeats and realleges each and every allegation set forth in each and every preceding paragraph as if fully rewritten herein.

177.    At all times relevant, Defendant Summit County Sheriff Fatheree, in her official capacity as Summit County Sheriff, was an "Employer" as defined by R.C. § 4112.01(A)(2).

178.    At all times relevant, Plaintiff was employed by Defendant Summit County Sheriff as a Deputy Sheriff with the Summit County Sheriff's Office.

179.    Plaintiff is African American.

180.    Throughout the course of his employment, Plaintiff was consistently treated differently than his similarly-situated peers by his employer and supervisors because of his race, in violation of R.C. § 4112.02(A).

181.    As set forth above, Plaintiff had previously complained of and actively opposed racial discrimination and other conduct in violation of R.C. § 4112.02 *et seq.* during his employment with the Summit County Sheriff's Office.

182.    Defendant Rhoades was Plaintiff's supervisor at the time of his wrongful termination, and had demonstrated racial animus toward Plaintiff prior to his termination.

183.    Defendant Barry was also Plaintiff's supervisor and was the Sheriff of Summit County at the time of Plaintiff's wrongful termination, and had demonstrated racial animus toward Plaintiff prior to his termination.

184.    Defendant Kline was responsible for investigating Plaintiff's alleged OHLEG misuse and participated in Plaintiff's unlawful termination predicated on race.

185.    As set forth above, Defendant Summit County Sheriff and the Defendants set forth in this Claim for Relief unlawfully and pretextually terminated Plaintiff's employment, falsely claiming that Plaintiff had violated the rules and regulations governing use of the Ohio Law Enforcement Gateway.

186.    Plaintiff was treated differently than similarly situated White deputies and was terminated because of his race and because of his prior opposition to racial discrimination in the Summit County Sheriff's Office in violation of R.C. § 4112.02(A) and (I).

187.    Defendants Rhoades, Kline and Barry actively encouraged, aided, and abetted the disparate treatment and termination of Plaintiff based upon his race. In this Claim for Relief, Defendants Rhoades, Kline and Barry are individually sued only for specifically violating R.C. § 4112.02(J).

188.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendants Summit County Sheriff, Rhoades, and Barry described herein, Plaintiff suffered and will continue to suffer damages, including past and future lost wages, lost earning capacity, extreme mental and emotional distress, and other economic and non-economic damages in an amount to be proven at trial.

**WHEREFORE,** Plaintiff prays for judgment against Defendant Summit County Sheriff Fatheree in her official capacity for:

   a. Compensatory damages, including legal fees and costs, in an amount that will fully and fairly compensate Plaintiff for the harms and losses he suffered, including lost wages, lost earning capacity, and emotional injuries;

   b. Costs of suit and reasonable attorneys' fees and interest, both pre-judgment and post-judgment; and

   c. All such other relief to which the Plaintiff is entitled and/or the Court deems equitable.

**WHEREFORE,** Plaintiff prays for judgment against Defendants Rhoades, Kline and Barry for:

   a. Compensatory damages, including legal fees and costs, in an amount that will fully and fairly compensate Plaintiff for the harms and losses he suffered, including emotional injuries and defamation to his reputation;

   b. Punitive damages against Defendants Rhoades, Kline and Barry in an amount that will serve to adequately punish and deter the acts and omissions of Defendants Rhoades, Kline and Barry alleged herein;

   c. Costs of suit and reasonable attorneys' fees and interest, both pre-judgment and post-judgment; and

   d. All such other relief to which the Plaintiff is entitled and/or the Court deems equitable.

## <u>FOURTH CLAIM FOR RELIEF</u>

### (Intentional Infliction of Emotional Distress Against Defendants McMillan, Forney, Kline, Rhoades and Barry)

189.    Plaintiff repeats and realleges each and every allegation set forth in each and every preceding paragraph as if fully rewritten herein.

190.    As described throughout this Complaint, Defendants McMillan, Forney, Kline, Rhoades, and Barry either intended to cause emotional distress or knew or should have known that their actions would result in severe emotional distress to Plaintiff.

191.    Defendants McMillan, Forney, Kline, Rhoades, and Barry's conduct, which included maliciously prosecuting Plaintiff for heinous crimes he did not commit, and terminating his employment based upon his race, was so extreme and outrageous as to go beyond all possible bounds of decency and be utterly intolerable in a civilized society.

192.    As a direct and proximate result of the extreme and outrageous conduct as alleged herein, Plaintiff endured and suffered psychic injury; and the mental anguish suffered by Plaintiff was serious and of a nature that no reasonable person could be expected to endure.

193.    At all times relevant, Defendants McMillan, Forney, Kline, Rhoades, and Barry were acting under color of law and within the scope of their employment and their official duties as law enforcement officers employed by the City of Akron and the Summit County Sheriff's Office.

**WHEREFORE,** Plaintiff prays for judgment against Defendants McMillan, Forney, Kline, Rhoades, and Barry, jointly and severally, for:

a.  Compensatory damages, including legal fees and costs, in an amount that will fully and fairly compensate Plaintiff for the harms and losses he suffered, including emotional injuries;

b.  Punitive damages against Defendants McMillan, Forney, Kline, Rhoades, and Barry in an amount that will serve to adequately punish and deter the acts and omissions of said Defendants alleged herein;

c.  Costs of suit and reasonable attorneys' fees and interest, both pre-judgment and post-judgment; and

d. All such other relief to which the Plaintiff is entitled and/or the Court deems equitable.

## FIFTH CLAIM FOR RELIEF

### (Malicious Prosecution Claim Against Defendants McMillan and Forney Under Ohio Law)

194.   Plaintiff repeats and realleges each and every allegation set forth in each and every preceding paragraph as if fully rewritten herein.

195.   For the same reasons Defendants McMillan and Forney are liable for malicious prosecution under federal law, they are also liable for malicious prosecution under Ohio law.

196.   Defendants McMillan and Forney engaged in, as set forth herein above, malicious, willful, wanton, bad faith conduct and/or in a manner whereby they acted with conscious and reckless disregard rendering them unentitled to state law immunity for their conduct.

**WHEREFORE,** Plaintiff prays for judgment against Defendants McMillan and Forney, jointly and severally:

a. Compensatory damages, including legal fees and costs, in an amount that will fully and fairly compensate Plaintiff for the harms and losses he suffered, including emotional injuries and defamation to his reputation;

b. Punitive damages against Defendants McMillan and Forney in an amount that will serve to adequately punish and deter the acts and omissions of Defendants McMillan and Forney alleged herein;

c. Costs of suit and reasonable attorneys' fees and interest, both pre-judgment and post-judgment; and

d. All such other relief to which the Plaintiff is entitled and/or the Court deems equitable.

***TRIAL BY JURY ON ALL CLAIMS FOR RELIEF HEREBY DEMANDED.***

*/s/ Nicholas A. DiCello*
NICHOLAS A. DICELLO (0075745)
JEREMY A. TOR (0091151)
MICHAEL P. LEWIS (0099621)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (FAX)
*ndicello@spanglaw.com*
*jtor@spanglaw.com*
*mlewis@spanglaw.com*

IAN N. FRIEDMAN (0068630)
**FRIEDMAN MENASHE NEMECEK & LONG, LLC**
1360 East 9th Street, Suite 650
Cleveland, OH 44114

***Counsel for Plaintiff***

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 7th day of July 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

*/s/ Nicholas A. DiCello*
NICHOLAS A. DICELLO (0075745)
JEREMY A. TOR (0091151)
MICHAEL P. LEWIS (0099621)