**IN UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTONIO WILLIAMSON, | ) | CASE NO. 1:21-cv-00565 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | **<u>MEMORANDUM OPINION AND</u>** |
| | ) | **<u>ORDER</u>** |
| SHERIFF KANDY FATHEREE, *et al.*, | ) | |
| | ) | **<u>(Resolving Docs. 207, 211, 212, 213,</u>** |
| Defendants. | ) | **<u>and 218)</u>** |

On March 11, 2020, a jury empaneled in an Ohio court of common pleas acquitted Plaintiff Antonio Williamson of two counts of sexual battery and one count of gross sexual imposition. Three years earlier on the day of the alleged crimes, Plaintiff was serving his community as a lieutenant of the Summit County Sheriff's Office. Plaintiff lost that job and almost his liberty as a consequence of the events that unfolded on March 19, 2017 and forward.

After having gone through the ordeal of a criminal trial and losing his job, Plaintiff sued those who in his view had some role to play in charging him or in terminating his employment with the SCSO. Like many defendants acquitted of criminal charges, Plaintiff seeks some form of vindication beyond the verdict. This lawsuit is the vehicle he uses. The motivation to sue is further fueled by the belief that racial animus caused him to be criminally charged and cost him his livelihood.

All the defendants reject this narrative. And rather strenuously at points. Their collective message is clear: law enforcement officers were merely doing their jobs by gathering and investigating evidence of criminal conduct wherever that evidence led them, even if it meant charging one of their own. They have expressed their disagreement at this juncture in the case through four separate motions for summary judgment and a motion to exclude testimony and evidence from an expert witness Plaintiff has identified. Now that these motions have been thoroughly briefed by both sides, the Court carries out its own role in this drawn-out saga by adjudicating them.

**I.**

*Background Summary Facts.* The following material and undisputed facts provide a summary that helps to explain the pending motions. Other facts are discussed in the sections that follow.

In addition to his regular job as a lieutenant in the SCSO, Plaintiff from time to time worked extra security details at various locations. On the evening of Saturday, March 18, 2017, he began working a secondary job assignment at an apartment complex in Akron, Ohio. He began at about 10:00 p.m. that evening and continued into the early morning hours of the following day. While working this extra detail, he met up with Moriah Asefi who at the time was drunk or high or both, and was walking the streets near the apartment complex looking for a hotel for the night. Ms. Asefi would later report that an individual in a police cruiser in full uniform had her get into the police cruiser and forced her to perform oral sex on him.

Ms. Asefi ended up filing a criminal complaint with the Akron Police Department. Her criminal complaint triggered an investigation by the Akron PD. She described the assailant as being a black male dressed as a deputy sheriff with a hat. She also provided details as to the location and time of the incident. The Akron PD advised the SCSO of the incident to see if any SCSO officer might have been working that night at the location the victim specified. The SCSO identified two deputies who fit the victim's description. One of them was Plaintiff. The accuser later identified Plaintiff in a photo array as being her assailant.

When police interviewed Plaintiff, he admitted being at the apartment complex across the midnight hour between March 18th and March 19th working at his secondary job. He admitted having met Ms. Asefi on the date, at roughly the time and at the location she had provided to the police. Plaintiff said he tried to help her find a hotel and then drove off. Ms. Asefi told police that after forcing her to perform oral sex on him, Plaintiff drove her to an IHOP restaurant where he dropped her off.

The Summit County Prosecutor eventually presented to a grand jury a five-count indictment against Plaintiff. The indictment alleged one count of rape (F-1), two counts of sexual battery (F-3), one count of gross sexual imposition (F-4), and one count of kidnapping (F-1). Plaintiff was arraigned in state court on July 20, 2017 in case no. CR-2017-07-2512.

In its investigation of the alleged criminal conduct, the Akron PD wanted to see if Plaintiff had been searching for information about his accuser after the encounter on March 19, 2017. One way he might have done that was through the Ohio Law

Enforcement Gateway, which is a computer database search program tied to Ohio's Law Enforcement Automated Data System used by law enforcement across the state and linked to other law enforcement agencies across the country. Primary OHLEG searches allow authorized users to research a wide variety of typically confidential data such as driving records, vehicle information, license photos, personal data, corrections records, and incident reports tied to various agencies. Secondary OHLEG searches allow authorized users to see who else has been searching for the object of the OHLEG search being undertaken by the user. These databases are designed for law enforcement purposes only. Unauthorized use is a crime in Ohio.

On October 4, 2017, the SCSO asked the Ohio Attorney General's Office for an audit report of Plaintiff's usage of OHLEG. Later that day, the SCSO received the audit report from the OAG. The audit report showed that Plaintiff had not searched his accuser on the OHLEG system. He had, however, conducted self-searches 36 times from January 1, 2014 to October 4, 2017. Ten of them were primary searches and 16 of them were secondary searches.

The OAG directed the SCSO to investigate these self-searches, since they are in violation of the rules and regulations governing OHLEG usage. The OAG further directed the SCSO to submit the results of its investigation to the Summit County Prosecutor, since unauthorized self-searches constitute a fifth-degree felony under Ohio Rev. Code § 2913.04(D) and (I).

Defendant Jason Kline, then a detective with the SCSO, was assigned as the SCSO's contact for Akron police working on the case. He was also assigned the task

of investigating the self-searches conducted by Plaintiff. Defendant Kline found ten instances where Plaintiff had improperly accessed OHLEG and conducted primary self-searches. As directed by the OAG, Defendant Kline submitted the results of his investigation to the Summit County Prosecutor for further review. That office independently determined that there was sufficient evidence—probable cause—to present the matter to a grand jury. Following presentment, the grand jury indicted Plaintiff on January 2, 2018 on ten counts for OHLEG misuse pursuant to Ohio Rev. Code § 2913.04(D).

After the grand jury handed down the supplemental indictment, the SCSO conducted an internal disciplinary investigation of Plaintiff's misuse of OHLEG. In compliance with the collective bargaining agreement governing Plaintiff's employment at the time, the SCSO gave Plaintiff notice of the rules and regulations he had violated through his alleged misuse of OHLEG. At a pre-disciplinary hearing on April 16, 2018, Plaintiff appeared with his criminal defense lawyer and his union representative. Neither presented evidence to demonstrate that Plaintiff's self-searches were for a legitimate law enforcement purpose. Three days later on the unanimous recommendation of the disciplinary committee, Defendant Steve Barry, who was at that time the Summit County Sheriff, terminated Plaintiff's employment with the SCSO because Plaintiff had violated OHLEG rules and regulations and other internal rules and regulations by misusing the OHLEG system.

On May 15, 2018, Plaintiff moved to sever the ten OHLEG-related counts from the five sexual assault-related counts. The state trial court granted that motion. Two

months later on August 3, 2018, Plaintiff moved to dismiss the ten OHLEG-related counts on a theory of selective prosecution based on his race. The parties agreed to set aside that motion and to try the first five counts separately.

After a substantial period of discovery and pretrial motion practice, on March 2, 2020, the state voluntarily dismissed the rape and kidnapping charges. The case proceeded to trial that day on the three remaining sexual assault-related counts. On March 11, 2020, a jury found Plaintiff not guilty on all three counts.

Later that year on August 3, 2020 after the completion of briefing, the state trial court heard Plaintiff's motion to dismiss for selective prosecution concerning the ten OHLEG-related counts. The next day Plaintiff moved to dismiss those remaining counts on grounds of void for vagueness. On February 24, 2021, the state trial court granted Plaintiff's motion to dismiss for selective prosecution. Less than a month later on March 10, 2021, Plaintiff filed this federal lawsuit.

In the meantime, the state appealed the order granting Plaintiff's motion to dismiss the ten OHLEG-related counts for selective prosecution. On January 26, 2022, the state court of appeals reversed the state trial court's order on selective prosecution and remanded the case back to the trial court. Over a year later on May 1, 2023, the state moved to dismiss the remaining charges in the indictment. It explained that "the State does possess evidence of the elements of [the OHLEG-related] offenses. However, based upon data from the Ohio Attorney General's Office, received through discovery on April 11, 2023, and statements of several deputies employed by the Summit County Sheriff's Office during the period of 2014-2017, received through

discovery on April 26, 2023, there is significant evidence to support the affirmative defense listed in R.C. 2913(C)(1) that '(a)t the time of the alleged offense, the actor, though mistaken, reasonably believed that the actor was authorized to use or operate the property.' " Later that day, the state trial court granted that motion, thus bringing to a close Plaintiff's criminal case.

On February 19, 2025 and on March 20, 2025, an arbitration hearing was held on a grievance Plaintiff had filed in 2018 under the terms of the officers' collective bargaining agreement. He filed the grievance to protest the termination of his job for violations of the rules and regulations governing OHLEG use. On June 12, 2025, the arbitrator issued his decision, finding that the SCSO did not have just cause to terminate Plaintiff's employment under the circumstances presented, including certain mitigating factors, and in light of the SCSO's treatment of other similarly situated employees. The SCSO has appealed that opinion to the state trial court in case no. CV-2025-09-4376. The parties are awaiting a ruling from the state court.

## II.

*Summary Judgment Applying Both State Law and Federal Law.* Plaintiff's first amended complaint (Doc. 33, PageID #352) rests on both federal law and Ohio law. That translates into two paths of legal analysis. Federal law provides the rule of decision for the first two causes of action. That means federal law determines what Plaintiff must show to find Defendants liable for the unlawful conduct in the first two causes of action. Ohio law provides the rule of decision for the last three causes of action. That means Ohio law

determines what Plaintiff must show to find Defendants liable for the unlawful conduct in the last three causes of action. Federal law, however, answers the question of how Plaintiff must proceed in order to get to the substantive determination of liability. That means federal law governs the procedure for getting to that point in the case. *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–96 (1941).

This last point is especially important here because Defendants are seeking to prevent Plaintiff from ever getting to the substantive determination of liability by short-circuiting his case through the procedural steps of their dispositive motions for summary judgment. And one of the procedural areas where federal law governs is the standard for summary judgment. *See Klaxon Co.*, 313 U.S. at 496–97; *Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 408 (6th Cir. 2006).

Under Fed. R. Civ. P. 56, the Court must grant Defendants' various motions for summary judgment if they show there is no genuine dispute as to any material fact, as supported by the record, and that Defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine where the evidence presented is such that a reasonable jury could return a verdict for the non-movant. *Anderson*, *id.* The Court makes this determination under the evidentiary standard applicable to the case in a trial on the merits. In most civil cases including this one, a dispute over a material fact is genuine where a reasonable jury could find for the non-movant by a preponderance of evidence. *Anderson*, 477 U.S. at 252.

*See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (finding that the nonmoving party must do more the simply show that there is some metaphysical doubt as to the material facts) (citations omitted).

In adjudicating Defendants' motions, the Court accepts the evidence Plaintiff submits as true, and examines the facts and draws all reasonable inferences from those facts in a light most favorable to him. *Pelland v. Wal-Mart Stores, Inc.*, 282 F. Supp. 3d 1019, 1023 (N.D. Ohio 2017) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992)); *84 Video/Newsstand, Inc. v. Sartini*, slip op., 2009 WL 10656014, at *5 (N.D. Ohio June 22, 2009), *aff'd,* 455 F. App'x 541 (6th Cir. 2011) (citations omitted); *Santana-Guillen v. Johnson & Johnson*, slip op., 2009 WL 1545791, at *2 (N.D. Ohio June 3, 2009) (citations omitted). Defendants have the burden of production with respect to evidentiary support for their motions, and must provide sufficient evidence such that a reasonable jury could rule in their favor. Plaintiff in turn has an affirmative duty to point out specific facts in the record that establish a genuine issue of material fact. *Santana-Guillen*, *id.*; *Anderson*, 477 U.S. at 252 (noting that the non-movant must show more than "[t]he mere existence of a scintilla of evidence" in opposing a motion for summary judgment).

Summary judgment is appropriate if Plaintiff fails to present evidence sufficient to establish the existence of an element essential to his case and on which he would bear the evidentiary burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56 details the procedures for how the parties present and for how the Court considers that evidence. *See* Fed. R. Civ. P. 56(c), (d), and (e). As noted above, the law requires the

Court to view the facts and to draw reasonable inferences in the light most favorable to the nonmoving party. *Kirilenko-Ison v. Bd. of Educ. of Danville Independent Schools*, 974 F.3d 652, 660 (6th Cir. 2020). A non-movant's testimony, even if self-serving, may be sufficient to defeat a motion for summary judgment unless it is demonstrably false or totally implausible. *See Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020); *Smith v. P.A.M. Transport, Inc.*, 154 F.4th 375, 382 (6th Cir. 2025).

The evidence proffered by both sides spans over eight years and covers facts that go beyond a decade. A voluminous case record to say the least, crossing over into arbitration rulings, state trial court rulings, and a state court of appeals opinion—all considered by the Court even if not specifically cited here. The parties' comprehensive briefing of the issues helps to distill this record in support of their respective versions of what happened here. It is now the Court's task to adjudicate their motions.

## III.

*Motion for Summary Judgment by Defendant City of Akron.* Plaintiff names the City of Akron as a defendant in his second cause of action in the first amended complaint. (Doc. 33, PageID #358) He alleges a failure to train and to supervise members of the Akron PD and alleges unconstitutional customs, policies, and practices that caused constitutional violations, all in violation of 42 U.S.C. § 1983. (*Id.*, PageID #387)

Defendant Akron filed a motion for summary judgment on January 29, 2026. (Doc. 212, PageID #6074) It argues that Plaintiff failed to plead his claim under

*Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978), with sufficient particularity. Defendant Akron argues that the amended complaint contains "the barebones recitation of the elements of *Monell* liability without pleading any actionable facts." (Doc. 212, PageID #6077) It also argues that there is no underlying constitutional violation as *Monell* requires. To the extent his claim is based on his arrest, the two-year statute of limitations bars Plaintiff's claim. Plaintiff turned himself in to the Akron PD on July 20, 2017 to address the warrant against him.

Defendant Akron further argues that the officers from the Akron PD did not violate Plaintiff's constitutional rights, as there was probable cause supporting the charges brought against Plaintiff. In brief:

- The officers received a report from Ms. Asefi claiming that she had been sexually assaulted by a male dressed as a sheriff's deputy in a SCSO cruiser.

- The victim described the male as being a light skinned black man between 5'7" and 6' tall and between 30 and 37 years of age.

- When the police officers started to investigate the report by contacting the SCSO, the SCSO told them that two sheriff deputies who could possibly match the description worked secondary jobs in the area where Ms. Asefi claimed to have been assaulted.

- The police officers confirmed that, of the two deputies who could possibly match the description given by the victim, Plaintiff was the one working on the night in question.

- When the police officers initially interviewed Plaintiff, he initially denied encountering anyone that evening. He, however, changed his story and said that he had spoken to Ms. Asefi and tried to help her look up hotels. This interaction with

the victim corroborated the accuser's story.

- The police officers corroborated other portions of Ms. Asefi's story, including that she had been at an IHOP restaurant on Arlington Road and took a taxi to a hotel that night.

- Upon interviewing the taxi driver who took Ms. Asefi to a hotel that night, the police officers corroborated still other portions of her story. The taxi driver told the police officers that Ms. Asefi had told him that she had been assaulted by a sheriff's deputy that night.

- The victim picked out Plaintiff from a photo array.

(*Id.*, PageID #6078-80)

Defendant Akron also argues that Plaintiff has not pointed to any evidence to show a genuine issue of material fact on any of the theories upon which *Monell* liability can rest (*e.g.*, the existence of an illegal official policy or enactment; the ratification of illegal decisions by an official with final decision-making authority; the existence of a policy of inadequate training or supervision; and a pervasive practice of or the existence of a custom of tolerance of or acquiescence in federal rights violations). *See*, *e.g.*, *Chick v. Taylor County*, slip op., 2026 WL 384165, at *2 (6th Cir. Feb. 11, 2026); *Buehner v. City of Cleveland*, 788 F. Supp. 3d 827 (N.D. Ohio 2025).

There is no evidence of a written policy or legislation evincing an official policy of encouraging officers to make factual errors in their written reports to bolster claims of probable cause. There is no evidence of a pattern or practice of officers handing off files to prosecutors for presentation to a grand jury where probable cause does not exist and the police reports contain knowing and reckless errors. There is no evidence of

other cases or a series of cases establishing that Defendant Akron failed to adequately supervise or train its police officers. And there is no evidence of a policy or practice by which Defendant Akron allows officers to bring charges against individuals with less than probable cause, or by which Defendant Akron encourages or permits officers to put inaccurate information in their reports, thus ratifying the alleged unconstitutional conduct outlined in the amended complaint. (*Id.*, PageID #6080-82)

Plaintiff chose not to oppose Defendant's Akron's summary judgment motion. (Doc. 242, 3/30/26) He made clear in his notice, however, that he does "oppose all other pending motions for summary judgment and is filing briefs in opposition to these motions." (*Id.*, PageID #8233)

The record is devoid of any evidence to support any of the theories on which *Monell* liability could rest. And Plaintiff has failed to point to any evidence supporting a legal basis for Defendant Akron's alleged liability under 42 U.S.C. § 1983. The absence of an opposition to Defendant Akron's motion for summary judgment reflects this conclusion and the additional conclusion that there is no genuine dispute as to any material fact with respect to any possible liability for Defendant Akron under Plaintiff's second cause of action. Furthermore, Defendant Akron has met its burden under Fed. R. Civ. P. 56. It is, therefore, entitled to a judgment in its favor as a matter of law on Plaintiff's second claim for relief.

*Motion for Summary Judgment by Defendant Sheriff Kandy Fatheree.* Plaintiff names Kandy Fatheree in her official capacity as the current Summit County Sheriff

in his third cause of action in the first amended complaint. (Doc. 33, PageID #357) He alleges unlawful discriminatory practices in violation of Ohio Rev. Code § 4112.02(A) and (I). (*Id.*, PageID #389) Plaintiff's first amended complaint sets forth the crux of this claim as follows: "Plaintiff was treated differently than similarly situated White deputies and was terminated because of his race and because of his prior opposition to racial discrimination in the Summit County Sheriff's Office." (Doc. 33, PageID #390)

Ohio Rev. Code § 4112.02(A) provides: "It shall be an unlawful discriminatory practice . . . (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(I) provides, "It shall be an unlawful discriminatory practice . . . (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

On August 4, 2023, Defendant Sheriff Fatheree filed a motion for judgment on the pleadings. (Doc. 40, PageID #517) The Court left intact Plaintiff's cause of action against Defendant Sheriff Fatheree under Ohio Rev. Code § 4112.02(A). It, however, dismissed Plaintiff's claim against her under Ohio Rev. Code § 4112.02(I) because

Plaintiff had not opposed Defendant Sheriff Fatheree's motion as to that ground. (Doc. 47, PageID #645)

Defendant Sheriff Fatheree filed a motion for summary judgment on January 29, 2026 to obtain a judgment in her favor on the remaining part of the third cause of action under Ohio Rev. Code § 4112.02(A). (Doc. 213, PageID #6087) Plaintiff opposed the motion. (Doc. 238, PageID #8125) Defendant Sheriff Fatheree filed a reply brief. (Doc. 254, PageID #8411)

Defendant Sheriff Fatheree rests her motion squarely on the core principles of Fed. R. Civ. P. 56, namely, that there are no genuine issues of material fact and she is entitled to a judgment as a matter of law. "Put simply, there is no evidence that the Sheriff's Office had knowledge of any deputy violating OHLEG that was not investigated and/or referred to the Prosecutor." (Doc. 213, PageID #6103) Citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Hudson v. Cleveland Clinic Foundation*, slip op., 2025 WL 1104854, at *4 (N.D. Ohio Apr. 14, 2025), she argues that Plaintiff cannot establish a prima facie case of race discrimination, namely, a showing that he was replaced by, or treated differently than, someone outside the protected class. Even assuming he could, she contends that the SCSO terminated Plaintiff's employment for a legitimate, non-discriminatory reason—violating multiple sections of the SCSO's rules and regulations regarding OHLEG misuse which, as already noted, constitutes a fifth-degree felony under Ohio law. Ohio Rev. Code § 2913.04(D). (Doc. 213, PageID #6104-05)

Defendant Sheriff Fatheree bases her argument primarily, though not

exclusively, on two things. The first is the affidavit of Michelle Y. Roach, who at the time of Plaintiff's termination worked in the Office of the Ohio Attorney General in the Bureau of Criminal Investigation as the Ohio Law Enforcement Gateway Quality Assurance Specialist. (Doc. 213-1, PageID #6114) The second is the investigative reports completed by Lieutenant Michael Lowe in August 2018 and email exchanges between Roach and Lowe or Roach and Kelly A. Pongracz who at the time was clerical supervisor, identification and records bureau/inmate accounts for the SCSO. (Doc. 202-2, PageID #3412-37)

Defendant Sheriff Fatheree's point is straightforward. The OAG directive to investigate Plaintiff's violations of OHLEG rules and regulations was based solely on the OAG's review of the audit reports sent to the SCSO on October 4, 2017. (Doc. 213-1, PageID #6116, ¶ 8) "When I directed the SCSO to investigate OHLEG Rules and Regulations violations of Williamson's self-searches, I did not know Williamson's race. Indeed, Williamson's race had nothing to do with my directive to investigate Williamson which was based solely upon the results of his OHLEG audit not his race, gender or any other alleged protected class status of which I had no knowledge." (*Id.*, ¶ 9) In turn, Lt. Lowe carried out his investigation pursuant to the OAG's instructions, and followed those instructions by forwarding the matter to the prosecutor's office for their review. (*Id.*, ¶ 6)

The OAG instructions were clear, too. And the SCSO followed those instructions. As SA Roach testified, "While I was the OHLEG Quality Assurance Specialist, the SCSO at all times complied with any directive of the OAG to investigate

any member's misuse of OHLEG. Other than Williamson I do not recall directing the SCSO to investigate and refer the matter to the prosecutor, if appropriate, for review for any other SCSO member." (*Id.*, PageID #6116-17, ¶ 11) Moreover, "[d]uring my tenure as the OAG OHLEG Quality Assurance Specialist there was never a time when the SCSO was directed to investigate a member's misuse of OHLEG and failed to do so." (*Id.*, PageID #6117, ¶ 14)

From these and other record facts, Defendant Sheriff Fatheree concludes, "There is no evidence that Plaintiff was treated differently than someone outside of his protected class. More specifically, there is no evidence that Plaintiff was treated less favorably than a similarly-situated Caucasian employee." (Doc. 213, PageID #6105) She also concludes that there could be no finding that the reasons for terminating Plaintiff's employment were pretextual.

Plaintiff is correct to remind the Court that it must consider whether a reasonable juror could find that the SCSO treated Plaintiff differently because he is black and that its stated reason for firing him was pretextual. (Doc. 238, PageID #8133) Defendant Sheriff Fatheree anticipates Plaintiff's arguments and challenges them with several material undisputed facts. The OAG is the entity that conducted the OHLEG audit that revealed Plaintiff's violations. The OAG is the entity that directed the SCSO to refer the results of the investigation to the prosecutor's office. No one disputes that a violation of OHLEG rules and regulations governing self-searches constitutes a felony. And no one disputes that the SCSO's rules and regulations set forth grounds for employment termination, which include the misuse of the OHLEG system. (Doc. 213,

PageID #6108-09)

At the pre-disciplinary hearing that took place on April 16, 2018 several months after the filing of additional charges associated with the OHLEG violations, neither Plaintiff, who invoked his Fifth Amendment rights, nor his counsel nor his union representatives attending the hearing presented any witnesses or documents to demonstrate that the 36 self-searches that Plaintiff had conducted on the OHLEG system had a legitimate law enforcement purpose. (Doc. 213, PageID #6108; Doc. 199-2. PageID #2843) The sheriff at the time, Defendant Steve Barry, terminated Plaintiff's employment in line with the disciplinary committee's unanimous recommendation. (Doc. 213, PageID #6108)

Plaintiff responds by boiling down the remaining part of his third cause of action against Defendant Sheriff Fatheree to the following: "This case concerns a single employment decision by the Summit County Sheriff's Office: its decision to terminate Antonio Williamson, a black lieutenant, for self-searching in the Ohio Law Enforcement Gateway ("OHLEG")." (Doc. 238, PageID #8130) He argues that Defendant Sheriff Fatheree's stated reason for firing him was not the real one and that Plaintiff was treated differently than similarly situated white deputies. (*Id.*)

Plaintiff points to the arbitration decision that issued last year on June 12, 2025. (Doc. 238, PageID #8130, 8133) Under the collective bargaining agreement, Plaintiff was entitled to a hearing to challenge his employment termination. As previously discussed, the arbitrator found that Defendant Sheriff Fatheree did not have just cause to terminate Plaintiff and that he was treated differently than other deputies who

unlawfully used the OHLEG system. (Doc. 201-2, PageID #3307)

Plaintiff even goes so far as to argue that the arbitrator's decision collaterally estops Defendant Sheriff Fatheree from relitigating the question of whether she had a legitimate basis to terminate Plaintiff and whether she treated him differently. These issues, in Plaintiff's view, "have been conclusively adjudicated." (Doc. 238, PageID #8147) "The only remaining issue is whether Williamson's termination was motivated, in part, by race." (*Id.*, PageID #8133)

In addition, Plaintiff points to the fact that his termination was based on ten self-searches dating back to 2014 even though the OHLEG prohibition against self-searches did not take effect until July 1, 2016. He also mentions that "[d]eputies were taught to self-search to practice using the system, and supervisors directed deputies to self-search for evaluations. The record therefore would permit a factfinder to conclude that the Sheriff treated conduct that was longstanding, work-related, and poorly understood as a terminable offense only when it came to Williamson." (*Id.*, PageID #8130-31)

In opposition to Defendant Sheriff Fatheree's motion, Plaintiff also recounts how a white sergeant (Chris Plance) self-searched in 2017. (*Id.*, PageID #8134-35, 8141, 8146, 8151, 8152) When the SCSO investigated the deputy's explanation and confirmed that a supervisor had directed the search, it treated the matter as a training issue rather than a termination. In fact, upon learning that there were widespread violations of the prohibition against self-searches using the OHLEG system, the OAG suspended use of the OHLEG system for the SCSO and required retraining across the

agency. "Even then, the Sheriff's Office did not investigate or terminate the other white deputies it knew had self-searched, including deputies identified in its own records as having done so repeatedly in a single day. Williamson, by contrast, lost his job. A reasonable factfinder could conclude that evidence demonstrates both disparate treatment and pretext." (*Id.*, PageID #8131) Further in Plaintiff's words, "the Sheriff used a rule that myriad deputies violated as the sole basis to fire a black deputy with a sterling record." (*Id.*, PageID #8133)

To oppose successfully a motion for summary judgment in an employment case such as this one, the law requires a plaintiff to point to evidence showing that the employer did not have a legitimate, non-discriminatory reason for terminating a plaintiff's job that was not pretextual. Plaintiffs most commonly resort to comparisons to make this showing. The comparisons, like those in Plaintiff's opposition brief, are intended to show that a plaintiff was treated differently (read: more harshly) than similarly situated employees of another race.

To reply to this law and to Plaintiff's opposition, Defendant Sheriff Fatheree brings the OAG back into the picture. "It is undisputed and there is no evidence that the Attorney General directed the Sheriff's Office to investigate any other member for OHLEG misuse at any time who was not investigated." (Doc. 254, PageID #8413) She further points out that following the OAG's investigation and audit report, another SCSO deputy who is white (Brad Tackett) was found to have violated OHLEG rules and regulations, was indicted, and was terminated from his employment. (*Id.*) This individual, in Defendant Sheriff Fatheree's view, "is a direct comparable Caucasian

employee who was treated the same as Plaintiff." (*Id.*, PageID #8416) Defendant Sheriff Fatheree goes further. "That undisputed comparator defeats Plaintiff's *prima facie* case as a matter of law." (*Id.*, PageID #8422)

As for the white sergeant Plaintiff mentioned who had violated OHLEG rules and regulations by conducting one self-search but was not terminated, he "is not a similarly-situated comparator" in Defendant Sheriff Fatheree's view. (*Id.*) Citing the affidavit from the OAG's OHLEG Quality Assurance Specialist who in the relevant time period was the person responsible for monitoring the use of OHLEG by law enforcement personnel in Ohio (Doc. 213-1, PageID #6114), Defendant Sheriff Fatheree "concedes that like Plaintiff, Sergeant Plance's single self-search was investigated by the Sheriff's Office. Plaintiff, however, ignores that the Attorney General instructed the Sheriff's Office to treat Sergeant Plance's single search as a training opportunity given that the single self-search was directed by the individual's supervisor at the time of his annual review and not done for personal use." (Doc. 254, PageID #8416) The OAG employee in charge of OHLEG monitoring says as much in her declaration. (Doc. 213-1, PageID #6117)

As already noted and as stated in Defendant Sheriff Fatheree's reply brief (Doc. 254, PageID #8416), at his pre-disciplinary hearing on April 16, 2018, Plaintiff chose to provide no evidence to show he had a legitimate law enforcement purpose for his 36 OHLEG self-searches. The investigation of his unlawful use of the OHLEG system never determined the purpose of those searches. Plaintiff also chose at that time to provide no evidence to show disparate treatment due to his race. Plaintiff was a

certified OHLEG instructor (Doc. 201-2, PageID #3301), and had been certified to use the OHLEG system since 2005 (Doc. 201-2, PageID 3296; Doc. 199-2, PageID #2828). These facts remain undisputed.

Plaintiff brings his cause of action against Defendant Sheriff Fatheree under Ohio Rev. Code § 4112.02(A). "Generally, Ohio courts look to federal anti-discrimination case law when examining employment discrimination cases made under state law." *Hinton v. Ohio Department of Youth Services*, 2022-Ohio-4783, ¶ 20 (10th Dist.) (citing *Nelson v. Univ. of Cincinnati*, 2017-Ohio-514, ¶ 31 (10th Dist.); *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 179 (2004); and *Williams v. City of Akron*, 107 Ohio St.3d 203, 210-11 (2005)).

Judgment as a matter of law is warranted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). *See* Ohio Civ. R. 56(C). When a plaintiff seeks redress under Ohio Rev. Code § 4112.02 due to alleged discrimination, Ohio courts follow the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 197 (1981).

Under this framework, Plaintiff must first make out a prima facie case of discrimination by showing 1) that he is a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by, or treated differently than, someone outside of the protected class. After Plaintiff

makes out a prima facie case of discrimination, Defendant Sheriff Fatheree must present a legitimate, nondiscriminatory reason for terminating Plaintiff's job. The burden of production then shifts back to Plaintiff to show that the proffered nondiscriminatory reason was pretext. *See generally Griffin v. Finkbeiner*, 689 F.3d 584, 592-93 (6th Cir. 2012) (quoting or citing *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008); and *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). *See also Plumbers & Steamfitters Joint Apprenticeship Comm.*, 66 Ohio St.2d at 197 (citing *McDonnell*, 411 U.S. at 802 and n.13; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578 (1978); and *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24 (1978)).

Plaintiff can refute the nondiscriminatory reason Defendant Sheriff Fatheree offers to justify Plaintiff's job termination "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003); *Turnbow-Avery v. Postmaster General*, slip op., 2026 WL 2413080, at *2 (6th Cir. June 26, 2026). *See also Plumbers & Steamfitters Joint Apprenticeship Comm.*, 66 Ohio St.2d at 198 (citing *McDonnell*, 411 U.S. at 804-05 and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)).

To survive the motion for summary judgment, Plaintiff "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th

Cir. 2007), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009).

Showing pretext, however, will not always be enough to sustain a jury's finding of liability. "[J]udgment as a matter of law for the defendant in an employment-discrimination case may be appropriate under certain circumstances even if the plaintiff has made out a prima facie case of discrimination and has shown pretext." *Griffin*, 689 F.3d at 593 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)). Defendant Sheriff Fatheree would be entitled to judgment as a matter of law "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, *id.* (citations omitted).

Given this extensive analytical framework, it is not surprising that "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148-49.

With this law as its guide and after assessing the arguments highlighted above and in the parties' extensive briefing on this dispositive motion, the Court concludes that Defendant Sheriff Fatheree has met the standard in Fed. R. Civ. P. 56 by showing

that there is no genuine dispute as to any material fact and that she is entitled to a judgment in her favor as a matter of law. The thread to the law governing summary judgment, which runs throughout the defendants' motions, gets lost in the voluminous record. Once reclaimed, though, that thread leads us to three immutable, undisputed facts that a reasonable jury could not ignore.

First, the only reason anyone in 2017 was investigating Plaintiff's use of the OHLEG system was to see if he was using the system to search the accuser who had reported the crimes that ultimately put Plaintiff under indictment. (Doc. 213-1, PageID #6115, 6122; Doc. 210-1, PageID #5161)

Second, the only entity authorized to audit an officer's use of the OHLEG system is the OAG. The person who authorized that audit testified that she didn't even know Plaintiff's race at the time. In other words, undisputed evidence shows that the sole reason the OHLEG investigation was put into motion was for law enforcement purposes alone. (*Id.*, PageID #6114-16)

Third, the timeline of events tells a story different from the one Plaintiff tells. The timeline looms large and is unchallenged. Moreover, it cannot be changed. It thus provides a helpful backdrop for understanding the many facets of this case.

For one, the timeline enables us to dispense with Plaintiff's argument that somehow the arbitrator's opinion creates a genuine issue of material fact. Plaintiff argues that the arbitration decision collaterally estops Defendant Sheriff Fatheree from offering a legitimate, non-discriminatory basis for termination. (Doc. 238, PageID #8147) Plaintiff views his argument as one of issue preclusion. (*Id.*) This argument

makes neither legal nor practical sense. And when examined closely, the arbitrator's decision in fact undercuts Plaintiff's overall position and illustrates why it is important to keep the timeline in the mind when adjudicating Defendant Sheriff Fatheree's motion.

Plaintiff states, "[A] neutral arbitrator agreed to by the parties has already determined, after a full and fair hearing on the issue, that the Sheriff's Office did treat Williamson differently than other similarly situated deputies by firing him for self-search in OHLEG only." (*Id.*, PageID #8129) He extends his observation to argue, "This well-reasoned decision against the Sheriff's Office demonstrates that a reasonable factfinder could reject the Sheriff's version of the facts and find in favor of Plaintiff." (*Id.*, PageID #8133) That's not so under undisputed facts.

In Plaintiff's mind, Defendant Sheriff Fatheree should be estopped from relitigating these issues decided by the arbitrator. (*Id.*, PageID #8130). Plaintiff overlooks the fact that the arbitrator's opinion is not final and is pending on appeal before the court of common pleas (CV-2025-09-4376). Putting aside that fact, the issues before the arbitrator concerned the union's collective bargaining agreement with the SCSO. Neither the procedural nor the substantive terms of that agreement are before the Court.

The arbitrator, Jerry B. Sellman, issued his decision on June 12, 2025 after holding a hearing on February 19, 2025 and March 20, 2025. The decision explains that the arbitration occurred pursuant to the collective bargaining agreement between the SCSO and the Summit County Sheriff's Supervisors Association, through its agent,

the Fraternal Order of Police, Ohio Labor Council, Inc. The decision also sets forth the parties' position. In particular, Plaintiff grieved that his actions did not constitute misconduct because "(1) he was instructed by his Supervisor(s) to conduct self-searches and thereby access to the system was authorized and for a law enforcement purpose, and (2) he was subject to disparate treatment such that the penalty of termination is arbitrary and capricious." (Doc. 201-2, PageID #3288)

The Court's decision here is not about whether an employer violated the terms of a union's collective bargaining agreement. An arbitrator's decision governed by the contractual terms of a collective bargaining agreement and not encumbered by federal employment law is not binding on a federal district court which is so encumbered. "While the expertise of arbitrators lies in the application of facts to the terms of an employee's contract or collective bargaining agreement, the expertise of federal courts lies in the application of facts to anti-discrimination statutes." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 548 (6th Cir. 2008). *See also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57 (1974) (in contrasting an arbitrator's decision under a collective bargaining agreement and a court's adjudication of a claim under Title VII, finding that "the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land") (footnote omitted) (citing *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-583 (1960)).

Practical reasons—and common sense—further caution against issue preclusion in this instance. The arbitrator conducted the grievance hearing and issued his decision in 2025—years after the incident in March 2017 that led to the investigation and

indictment of Plaintiff, after Plaintiff's indictment had been expanded to include OHLEG-related crimes, after the voluntary dismissal of some of the criminal charges against him, after his trial and acquittal, after the trial court's dismissal of the OHLEG-related counts, after the state court of appeals' decision reversing that ruling, and after the state's ultimate voluntary dismissal of those additional counts. The arbitrator's decision is over seven years removed from April 19, 2018 when the SCSO terminated Plaintiff's employment.

This matters because the Court must determine whether a reasonable juror could conclude that Defendant Sheriff Fatheree discriminated against Plaintiff because of his race when the SCSO terminated his job on April 19, 2018. The view from that time horizon is very different from the one Plaintiff uses to oppose the motion for summary judgment. The focus needs to be on the SCSO's motivation to terminate Plaintiff's job at that time. Subsequent events, where Plaintiff understandably prefers to look, can sometimes shed light on a party's discriminatory intent. In this instance, though, that light buttresses the conclusion that no reasonable juror could conclude that Defendant Sheriff Fatheree discriminated against Plaintiff because of his race when the SCSO terminated his job.

On April 16, 2018 at the pre-disciplinary hearing, Plaintiff chose to say nothing and presented no case on his own behalf. He presumably did so because he was then under indictment in a case (CR-2017-07-2512) pending in the Court of Common Pleas for Summit County, Ohio for one count of rape (F-1), two counts of sexual battery (F-3), one count of gross sexual imposition (F-4), one count of kidnapping (F-1), and ten

counts for violations of Ohio Rev. Code § 2913.04(D) for using the OHLEG system without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation (F-5). (Doc. 207-15, PageID #5031; Doc. 199-3, PageID #2974)

The participants of the pre-disciplinary hearing on April 16th knew which SCSO rules and regulations Plaintiff was accused of having violated. The grounds for Plaintiff's termination were clearly set forth.

For instance, SCSO Rule 1.1 required all employees to obey all laws of any state and local jurisdiction, which, pursuant to Rule 1.2, required only a preponderance of the evidence for establishing a violation and specifically noted that a conviction was not required for a finding of conduct that is prohibited by law. Rule 1.2 further stated, "It is not necessary for the employee to even be arrested, charged with a crime, or sued civilly in order to constitute that disciplinary action be brought or sustained against the employee." (Doc. 199-4, PageID #3000)

Rule 6.1 mandated that SCSO employees "will conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Sheriff's Office. Conduct unbecoming will include any behavior, acts, or statements . . . 6.1.1. Which tend to bring the Sheriff's Office, its administration, or Sheriff's Office personnel into disrepute or ridicule." (*Id.*)

Rule 16.14 mandated that SCSO employees "shall only use LEADS/OHLEG for law enforcement purposes in the performance of their assigned duties and in compliance with the guidelines for use established by LEADS/OHLEG." (*Id.*, PageID

#3002)

Rule 10.1 begins, "The tenure of every employee subject to the terms of this contract shall be during good behavior and efficient service. The Employer may take disciplinary action against ay [sic] employee in the bargaining unit only for just cause. . . . The Employer will follow progressive discipline in correcting behavior; however, discipline may be imposed based on the severity of the conduct or situation as determined by the Employer." (Doc. 201-2, PageID #3289) Forms of disciplinary action ranged from a written warning to discharge. (*Id.*, PageID #3280-90)

The record of the disciplinary hearings contains no evidence—and Plaintiff has pointed to none—to suggest that the SCSO treated Plaintiff differently in these disciplinary proceedings because of his race. No reasonable juror could conclude that Plaintiff lost his job because of racial discrimination. Nor could a reasonable juror conclude that the reasons given for that termination were pretextual. Plaintiff violated rules that were known to him at the time of the violations. He was aware of the possible penalties for those violations. The rules and regulations gave the SCSO disciplinary authority that included terminating the officer's employment for these violations. The SCSO exercised its authority following the prescribed procedures.

Plaintiff's "testimony of disparate, race-based treatment grounded in experience and perception" could be sufficient to create a factual dispute as to whether similarly situated non-minority employees were treated more favorably than Plaintiff. *Smith v. P.A.M. Transport, Inc.*, *supra*, 154 F.4th at 387 (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 563, 573-74 (6th Cir. 2001)). Comparators help a non-movant make the

showing necessary to defeat summary judgment. The comparators, however, have to be relevant and similarly situated as the non-movant. "[C]omparators must be similarly situated 'in all relevant respects' to the plaintiffs. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). Otherwise, a factor other than racial animus could explain the difference in treatment." *Stanford v. Northmont City School District*, slip op., 2023 WL 6389624, at *4 (6th Cir. Oct. 2, 2023). *See Rembert v. Swagelok Co.*, slip op., 2023 WL 3094546, at *7 (Apr. 26, 2023) ("the comparator must be the same in all 'relevant respects' ") (quoting *Johnson v. Ohio Dept. of Public Safety*, 942 F.3d 329, 331 (6th Cir. 2019)); *Middleton v. Lexington-Fayette County Urban Govt.*, slip op. 2024 WL 692966, at *6 (6th Cir. Feb. 20, 2024) (requiring a plaintiff to show that the comparator is " 'similarly situated in all relevant aspects and has engaged in acts of comparable seriousness' ") (quoting *Tennial v. United Parcel Service, Inc.*, 840 F.3d 292, 304 (6th Cir. 2016)). *See also Hinton*, 2022-Ohio-4783, ¶ 23 (quoting or citing *Kenner v. Grant/Riverside Med. Care Foundation*, 2017-Ohio-1349, ¶ 33 (10th Dist.); *Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, ¶¶ 42-44 (10th Dist.); and *Mittler v. OhioHealth Corp.*, 2013-Ohio-1634, ¶ 36 (10th Dist.)) (same).

Plaintiff tries to build his prima facie case of disparate treatment through comparisons with the treatment other white employees received when they were found to have unlawfully used the OHLEG system. For instance, he tries to persuade the Court that the SCSO's decision not to terminate a white sergeant for his one-time improper use of OHLEG could be viewed as discriminatory intent. To accept this

argument, though, would be to bend credulity far beyond its breaking point.

It is undisputed that Plaintiff's use of OHLEG (36 times) along with his indictment (15 counts) for serious offenses (*e.g.*, two counts for F-1 offenses of rape and kidnapping) placed him in a position that is not comparable to the white sergeant's situation that Plaintiff advocates. The white sergeant Plaintiff points to was not under indictment for any crimes, whether serious or not.

Moreover, unlike Plaintiff, the white sergeant had committed a single self-search in 2017 that was directed by the officer's supervisor. The severity of the OHLEG violation was thus substantially different from Plaintiff's violations. The OAG advised the SCSO lieutenant handling this investigation that this one-time violation was a matter that should be addressed as a training issue. The OAG also confirmed that a supervisor's use of OHLEG to verify a subordinate's valid driver's license during the annual review process was an acceptable use of OHLEG. (Doc. 213-1, PageID #6117).

Plaintiff also attempts to build his prima facie case on the fact that the OAG directed the SCSO in 2018 to retrain all SCSO employees on the impropriety of self-searches. The OAG directed this retraining upon learning that year that SCSO officers may have been directed by their supervisors to self-search in conjunction with their annual performance evaluation. (*Id.*) Again, though, this situation is not comparable to Plaintiff's at all. In 2018 when the SCSO terminated Plaintiff's job, it had not been established by what authority or at whose direction, if anyone, did Plaintiff undertake the 36 self-searches. Plaintiff never offered then any explanation for those database

searches. And no lawful law enforcement purpose could be found by the SCSO, the prosecutor, or the OAG. (Doc. 201-2, PageID #3310)

His deposition testimony hurts his cause even further. He acknowledges, for instance, that OHLEG searches were strictly limited to law enforcement purposes. (*See*, *e.g.*, Doc. 199-1, PageID #2417) But throughout his testimony, his comparisons never moved beyond the unnamed group of SCSO officers who needed to be retrained on OHLEG after the OAG's audit. (*See*, *e.g.*, Doc. 199-2, PageID #2826-28) Furthermore, Plaintiff's deposition testimony that he was told by his supervisors to do the self-searches for evaluations (*see*, *e.g.*, *id.*, PageID #2832) or for practice (*see*, *e.g.*, Doc. 199-1, PageID #2454) or for annual reviews (*see*, *e.g.*, *id.*, PageID #2446) is contradicted by Plaintiff's acknowledgment that he really couldn't recall why he did the self-searches identified in the audit (*see*, *e.g.*, *id.*, PageID #2448, 2455, 2456) or if anyone had ordered him to do so (*see*, *e.g.*, *id.*, PageID #2449).

Testimony such as this was, of course, unavailable to the SCSO in 2018 when Plaintiff chose to remain silent and to offer no evidence why he made 36 self-searches on the OHLEG system. A rational jury could not ignore the timeline or the absence of evidence in 2018 showing that Plaintiff had conducted the self-searches for law enforcement purposes or at the behest of a supervisor.

Plaintiff now seeks to have the Court turn back the hands of time and rewrite history, but this time with evidence that simply was not present when the SCSO terminated Plaintiff's position for cause. Nevertheless, the look-back is instructional insofar as it underscores the weakness of Plaintiff's claim of employment

discrimination. His deposition testimony included the assertion that he "was the only person terminated for OHLEG in the history of the Summit County Sheriff's Office, because of the color of my skin, because of my race, because I am African-American." (Doc. 199-2, PageID #2685) Yet the evidence Defendant Sheriff Fatheree presents of a white SCSO deputy who was found to have violated OHLEG rules and regulations, who was indicted on May 24, 2018 (CR-2018-05-1628) on 27 counts of unauthorized OHLEG or LEADS (Law Enforcement Automated Database System) use (Doc. 199-4, PageID #3020), and whose employment was terminated contradicts this assertion. Her evidence also represents a far more comparable case showing that the SCSO did not treat Plaintiff differently because of his race. No reasonable jury could ignore what this evidence shows: a comparator who was similarly terminated like Plaintiff for conducting unlawful self-searches on the OHLEG system. Race did not play a role in either officer's termination. No reasonable juror could ignore that fact.

If anything, Defendant Sheriff Fatheree understates her position. After all, neither side has presented evidence of a comparator who like Plaintiff was facing five serious felony charges along with the ten additional OHLEG-related charges at the time of the disciplinary proceedings. Even though he presented no evidence to bolster his position, Plaintiff was in effect asking the SCSO not to exercise the authority it clearly had under its rules and regulations to impose a discipline "based on the severity of the conduct or situation as determined by the Employer" where possible disciplinary steps included termination of employment. (Doc. 201-2, PageID #3289)

Certainly, conviction under the counts as charged would have constituted more

serious conduct than being under indictment for the same. Like all other employees subject to the SCSO's rules and regulations, however, Plaintiff knew that a conviction was not required for a finding of conduct that is prohibited by law, and that it was not necessary for the employee even to be arrested, charged with a crime, or sued civilly in order to constitute conduct warranting disciplinary action. (Doc. 199-4, PageID #3000) No reasonable juror could ignore these undisputed facts.

Defendant Sheriff Fatheree's evidence of a white SCSO deputy who was identified through the OAG's OHLEG audit, who was criminally investigated and indicted for unlawful self-searches, and whose job with the SCSO was terminated perhaps defeats Plaintiff's prima facie case as she insists it does. (Doc. 254, PageID #8422) The Court is cautious in adopting this position. After all, the law tells us that even self-serving testimony may be sufficient to defeat a motion for summary judgment. *Smith v. P.A.M. Transport, Inc.*, 154 F.4th at 382. But not always. "For instance, where self-serving testimony is blatantly and demonstrably false, it understandably may not create a *genuine* issue of material fact, thereby allowing a court to grant summary judgment." *Davis*, 951 F.3d at 750 (emphasis in original) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008); and *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

There is no doubt that some of Plaintiff's testimony is demonstrably false. And there is no doubt that the firing of a similarly situated white employee for conducting unlawful self-searches adds to the already heavy load of evidence showing the

weaknesses in Plaintiff's case. And there is no doubt that the evidence Plaintiff points to—even when considered in a light most favorable to him and the same for facts and all reasonable inferences drawn from them—does not show in any way that the non-discriminatory reasons posited by Defendant Sheriff Fatheree for terminating Plaintiff's job with the SCSO were pretextual. A reasonable jury could not conclude otherwise.

The arbitrator's decision from last year doesn't change this conclusion. As noted above, the Court is not bound by the arbitrator's decision in the adjudication of Defendant Sheriff Fatheree's motion. Even if considered in this adjudication, however, the arbitrator's decision only adds to the evidence supporting her motion.

Plaintiff overlooks the fact that last June when the arbitrator decided that the SCSO had violated the terms of the collective bargaining agreement by terminating Plaintiff, the arbitrator had before him the long history of this case subsequent to the termination of Plaintiff's job. None of that history, of course, was available on April 19, 2018 when the SCSO terminated Plaintiff's job. As already noted, Plaintiff also presented no evidence at the 2018 pre-disciplinary hearing to suggest he was being treated differently from other similarly situated employees.

More than seven years later, Plaintiff points to the arbitrator's June 12, 2025 decision that found that the SCSO "did not have just cause to terminate Grievant's employment under the circumstances presented, including certain mitigating factors, and in light of the Employer's treatment of other similarly situated employees." (Doc. 201-2, PageID #3307). The arbitrator acknowledged that other deputies were

terminated for abuse of OHLEG. Those terminations in his view, however, were "not based solely on a self-search, but other more egregious conduct." (*Id.*, PageID #3312) That "other more egregious conduct" was: a deputy demanding that a dispatcher run a license plate for him while he was off-duty, claiming that the car was following him; a deputy having a dispatcher run a warrant check on a person at the deputy's rental property; and a deputy searching for information about subjects of his prurient interests. (Doc. 201-02, PageID #3305)

Seven years earlier on April 19, 2018 when the SCSO terminated Plaintiff's job, conduct far more egregious than the arbitrator's examples provided the Summit County Prosecutor with grounds to indict Plaintiff. When he received his termination letter (Doc. 199-4, PageID #3010), Plaintiff was under a 15-count indictment and the parties to the criminal case were still in the throes of discovery. At that time, without any evidence showing that Plaintiff had undertaken the self-searches for law enforcement purposes, it would have been easy to conclude that the self-searches were somehow a piece of the puzzle in the ongoing criminal investigation that prompted the OHLEG audit by the OAG. To view the self-searches in a vacuum by ignoring the other egregious conduct that Plaintiff was then charged with is to ignore the very context of his OHLEG violations. This is especially true given the fact that three self-searches on which the arbitrator focused occurred after (2 days, 236 days and 238 days) the alleged crimes had been reported. (Doc. 201-2, PageID #3308)

This analysis gives the Court an opportunity to address the state court of appeals opinion, *State v. Williamson*, 2022-Ohio-185 (9th Dist.), which reversed the state court

trial judge's finding that Plaintiff was the victim of selective prosecution. In an earlier order, the Court held that this opinion does not amount to issue preclusion on a key point in favor of all defendants. At that time, the Court also held that "issue preclusion cannot serve to dismiss [Plaintiff's] claim for race discrimination." (Doc. 47, 4/22/24, PageID #645) The order continued: "With that said, the Court notes that there are strong arguments that certain facts were established in the state court proceedings that will not be subject to dispute in this litigation." (*Id.*)

For purposes of Plaintiff's criminal case, the state court of appeals determined that the four white SCSO officers Plaintiff used as comparators, including the sergeant Plaintiff singles out in his opposition brief, were not similarly situated as Plaintiff. Unlike the four white SCSO officers, Plaintiff was subject to a criminal investigation at the direction of the OAG. *Williamson*, 2022-Ohio-185, ¶ 41. The OAG had instructed the SCSO to present the case to the Prosecutor's Office. *Id.*, at ¶ 48. Because Plaintiff's case did not proceed as an administrative investigation, Defendant Sheriff Fatheree did not have an opportunity to exercise her discretion. *See, e.g., id.*, at ¶ 43. Any unlawful animus or motivation as Plaintiff claims, therefore, could not have been a part of Plaintiff's state criminal case. And unlike the four white SCSO officers, there was no evidence that Plaintiff had conducted his self-searches for a law enforcement purpose. *Id.*, at ¶ 48.

Defendant Sheriff Fatheree urges the Court to consider this opinion and its findings as further evidence that Plaintiff cannot establish the fourth element of a prima facie case of race discrimination. (Doc. 213, PageID #6107) As before, the Court

moves cautiously in taking this particular step. It is also an unnecessary one, since the Court through its own analysis reaches the same conclusion as the state court of appeals. Nothing in the record indicates that Defendant Sheriff Fatheree purposely singled out Plaintiff for criminal prosecution based on his race. Nothing in the record, whether highlighted by Plaintiff or otherwise before the Court, shows that the nondiscriminatory reasons Defendant Sheriff Fatheree gave for prosecuting Plaintiff for his OHLEG-related violations were pretext. A reasonable jury would reach the same conclusion.

With a record as voluminous as this one, one might wonder how it is possible that Plaintiff nevertheless fails to meet his evidentiary burdens to survive Defendant Sheriff Fatheree's motion for summary judgment. The law answers that question. As already noted, "judgment as a matter of law for the defendant in an employment-discrimination case may be appropriate under certain circumstances even if the plaintiff has made out a prima facie case of discrimination and has shown pretext." *Griffin*, 689 F.3d at 593 (citing *Reeves*, 530 U.S. at 148). Defendant Sheriff Fatheree is entitled to judgment as a matter of law because the record conclusively reveals nondiscriminatory reasons for the employer's decision. Reading that record in a light most favorable to Plaintiff, he has "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, *id.* (citations omitted).

*Motion for summary judgment by Defendants Former Sheriff Steve Barry,*

*Detective Jason Kline, and Inspector Chris Rhoades, Sr.* The Court next considers the summary judgment motion filed by three other defendants associated with the SCSO: former Sheriff Steve Barry, Detective Jason Kline, and Inspector Chris Rhoades, Sr. Former Sheriff Barry started with the SCSO in 1979 as a deputy, and brought his career there to a close after being elected for two consecutive terms as county sheriff. He retired in January 2021. Det. Kline started his career with the SCSO as a deputy in 1994. Around 2005, he was assigned to investigations in the detective bureau, and continued to work in that bureau until his retirement in 2021. The SCSO has employed Insp. Rhoads for the past 48 years. He has been responsible for overseeing the Sheriff's office drug unit, detective bureau, and internal affairs department. (Doc. 218-1, PageID #6671)

Plaintiff names these three SCSO Defendants in his first claim for relief under 42 U.S.C. § 1983 for false arrest and malicious prosecution; in his third claim for relief under Ohio Rev. Code § 4112.02(A) and (I) for unlawful discriminatory practices and under Ohio Rev. Code § 4112.02(J) for actively encouraging, aiding, and abetting the disparate treatment of Plaintiff and termination of Plaintiff's job at the SCSO based upon his race; and in his fourth claim for relief for intentional infliction of emotional distress. (Doc. 33, PageID #385, 389, 391)

Plaintiff indicated in his opposition brief that he "does not oppose summary judgment as to Defendant Kline," and "does not oppose summary judgment on the malicious prosecution, false arrest claims, retaliation, and intentional infliction of emotional distress." (Doc. 240, PageID #8186, n.1) Plaintiff still opposes summary

judgment as to former Sheriff Steve Barry and Inspector Rhoades as to Plaintiff's third cause of action brought under Ohio law for aiding and abetting an unlawful discriminatory practice. In short, Plaintiff has chosen not to oppose summary judgment for two of the three causes of action he brings against two of the SCSO Defendants (Barry and Rhoades) and for all three of the causes of action he brings against one of the SCSO Defendants (Kline).

The Court first examines whether summary judgment is appropriate as to the SCSO Defendants on the third cause of action under Ohio Rev. Code § 4112.02(J). (Doc. 33, PageID #389). Plaintiff has sued the SCSO Defendants for allegedly having "actively encouraged, aided, and abetted the disparate treatment and termination of Plaintiff based upon his race." (*Id.*, PageID #390)

Aiding and abetting in this instance is set forth in Ohio law as follows:

> It shall be an unlawful discriminatory practice . . . (J) For any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

Ohio Rev. Code § 4112.02(J). To run afoul of this statute, the SCSO Defendants "must actively participate in, or otherwise facilitate, another's discriminatory act" in violation of § 4112.02. *Johnson-Newberry v. Cuyahoga Cty. Child and Family Serv.*, 2019-Ohio-3655, ¶ 21 (8th Dist.) (citing *Pittman v. Parillo*, 2017-Ohio-1477, ¶ 25 (6th Dist.)) The SCSO Defendants plainly fall within the definition of "person" under Ohio Rev. Code § 4112.01(A)(1).

Ohio case law provides direction as to the meaning of aiding and abetting.

> "Aid" is generally defined as "to assist" and "abet" as "to incite or encourage." *Evans v. Hillman Group, Inc.*, 2021 WL 1140100, *5 (S.D. Ohio Mar. 25, 2021); *Luke v. Cleveland*, 2005 WL 2245187, *8 (N.D. Ohio Aug. 22, 2005), citing *Horstman v. Farris*, 132 Ohio App.3d 514, 527, 725 N.E.2d 698 (2d Dist. 1999). To aid and abet, a person must " 'actively participate in, or otherwise facilitate, another's discriminatory act in violation of R.C. 4112.02.' " *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, 179 N.E.3d 687, ¶ 74 (2d Dist.), quoting *Johnson-Newberry v. Cuyahoga Cty.*, 2019-Ohio-3655, 144 N.E.3d 1058, ¶ 21 (8th Dist.); *see also Luke*, 2005 WL 2245187 at *8 (An aider and abetter [sic] is one who " 'knowingly does something which he ought not to do ... which assists or tends in some way to affect the doing of the thing which the law forbids.' "), quoting *State v. Stepp*, 117 Ohio App.3d 561, 568, 690 N.E.2d 1342 (4th Dist. 1997).

*Blagg v. S.T.O.F.F.E. Federal Credit Union*, 2024-Ohio-2579, ¶ 97 (8th Dist.).

Ohio law informs us that the Court's earlier finding—that Defendant Sheriff Fatheree is entitled to summary judgment on the discrimination claims brought under Ohio Rev. Code § 4112.02(A)—affects the adjudication of the SCSO Defendants' summary judgment motion as to aiding and abetting under § 4112.02(J). "When a court finds that a defendant is entitled to summary judgment on the underlying discrimination . . . claims, 'the court must also necessarily grant summary judgment on the claim of aiding and abetting those claims.' " *Martcheva v. Dayton Bd. of Ed.*, 2021-Ohio-3524, ¶ 75 (2d Dist.) (quoting *Weinrauch v. Sherwin-Williams Co.*, slip op., 2019 WL 3007031, at *14 (N.D. Ohio July 10, 2019)). *See also Pringle v. Richmond Heights School Dist.*, slip op., 2015 U.S. Dist. LEXIS 146218, at *62 (N.D. Ohio Oct. 27. 2015); *Dove v. Lakewood*, 2025-Ohio-453, ¶ 61 (8th Dist.); *Lloyd v.*

*Greater Cleveland Regional Transit Authority*, slip op., 202 WL 5077009, at *13 (N.D. Ohio Aug. 27, 2020) (citing *Toth v. Cardinal Health 414 LLC*, slip op., 2020 WL 1275095, at *10 (S.D. Ohio Mar. 17, 2020); *Demassimo v. Sagamore Hills Twp.*, slip op., 2017 WL 6344653, at *6 (N.D. Ohio Dec. 11, 2017); and *Woolf v. City of Streetsboro*, 2010 WL 4105550, at *15 (N.D. Ohio Oct. 18, 2010)). The finding that Defendant Sheriff Fatheree is entitled to summary judgment thus precludes as a matter of law Plaintiff's third claim for relief against the SCSO Defendants that they aided and abetted in that discrimination.

A look beyond this law, however, shows that the SCSO Defendants are still entitled to summary judgment on Plaintiff's third claim for relief. Plaintiff rests his aiding and abetting claim primarily on his opposition to Defendant Sheriff Fatheree's motion for summary judgment. (Doc. 240, PageID #8201) Yet it is undisputed that none of the SCSO Defendants had any material role in the criminal investigation of the alleged crimes of March 2017. And neither Defendant Barry nor Defendant Rhoades had any material role in the criminal investigation of the OHLEG-related violations.

The evidence shows that Defendant Kline's assignment to conduct the criminal investigation of Plaintiff's OHLEG violations resulted in his cross-checking and cross-referencing the audit report from the OAG to determine whether Plaintiff had a legitimate law enforcement purpose for the self-searches. (Doc. 218-1, PageID #6675) He found none. (Doc. 252, PageID #8391, 8400) He eventually presented his report to the Summit County Prosecutor together with the underlying evidence. (Doc. 218-

1, PageID #6675) When the prosecutor decided to pursue criminal charges associated with the OHLEG-related violations, Defendant Kline was called to testify before the grand jury. His testimony was limited to the factual findings from his investigation. (*Id.*, PageID #6676) Furthermore, he had no role in the administrative investigation or the internal pre-disciplinary proceedings that led to the termination of Plaintiff's job. (*Id.*, PageID #6689)

Defendant Rhoades was part of the disciplinary committee that unanimously recommended the termination of Plaintiff's job for his violation of various SCSO rules and regulations. And Defendant Barry made the final decision to terminate Plaintiff's job after a pre-disciplinary hearing in April 2018 where Plaintiff and his counsel presented no evidence, after a hearing officer's determination of just cause for termination in light of Plaintiff's violations, and after a unanimous disciplinary committee recommendation to terminate Plaintiff's job. (Doc. 219-1, PageID #6690) None of this history, though, shows evidence of any discriminatory animus motivating or any discriminatory reason underlying the termination of Plaintiff's job.

The Court's finding remains unaltered by consideration of alleged retaliatory conduct by SCSO Defendants Barry and Rhoades which Plaintiff also raised in his third claim for relief under Ohio Rev. Code § 4112.02(I). (Doc. 33, PageID #390) The alleged retaliatory conduct concerns a 2009 verbal complaint Plaintiff made to his supervisor regarding a nickname, an EEOC charge he filed that year relating to his supervisor's refusal to approve training opportunities, and other racial remarks. (Doc. 240, PageID #8196) Plaintiff's expressed concerns about black representation in the

SCSO apparently drew the attention and involvement of the NAACP. (*Id.*) In addition, in 2014 Defendant Barry promoted Plaintiff along with a white male deputy and a white female deputy to lieutenant. (*Id.*, PageID #8197) Defendant Barry thereafter temporarily rescinded the promotions to Plaintiff and the white female deputy because the white male deputy had scored several points better than they on the lieutenant's exam. (Doc. 218-1, PageID #6672) By then promoting the white deputy one day before promoting Plaintiff and the white female deputy, the white male deputy ended up with the higher seniority in the position.

The SCSO Defendants have shown that there is no genuine dispute as to any material fact regarding Plaintiff's retaliation claim. The SCSO Defendants have pointed out that for some of these complaints by Plaintiff, they were unaware of them (Doc. 218-1, PageID #6691, 6693), Plaintiff never reported them (*id.*, PageID #6692), or there was neither a substantive nor temporal causal nexus between Plaintiff's protected activities and the termination of his position in 2018 (*id.*, PageID #6692-93).

Nothing Plaintiff points to in support of his claim regarding aiding and abetting discrimination changes the Court's conclusion. Plaintiff argues three reasons why SCSO Defendants Barry and Rhoades are not entitled to summary judgment. (Doc. 240, PageID #8192-93) The first two reasons require a finding that there was a discriminatory termination to begin with. The Court has found, however, that there is no genuine issue of material fact as to Plaintiff's claim of racial discrimination in the termination of his job, and that Defendant Sheriff Fatheree is entitled to judgment on this claim as a matter of law. The same finding and its rationale apply with equal force

to Plaintiff's third claim against the SCSO Defendants for relief under Ohio Rev. Code § 4112.02(A).

Plaintiff's third reason argues that both SCSO Defendants Barry and Rhoades are not entitled to immunity as they contend under Ohio Rev. Code § 2744.03(A)(6). (Doc. 218-1, PageID #6695-97) According to Plaintiff, this is so because the aiding and abetting provision at Ohio Rev. Code § 4112.02(J) defeats immunity otherwise available through the operation of Ohio Rev. Code § 2744.03(A)(6)(c). The latter provision creates an exception to the general immunity provision where "[c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." Plaintiff cites *Hauser v. Dayton Police Dept.*, 140 Ohio St.3d 268, ¶ 16 (2014), and *Johnson-Newberry v. Cuyahoga Cty. Child and Family Serv.*, 2019-Ohio-3655, ¶¶ 31-33 (8th Dist.), in support. He also argues that recklessness, which is one of the exceptions to immunity under Ohio Rev. Code § 2744.03(A)(6)(b), presents a jury question. (Doc. 240, PageID #8192-93)

Plaintiff's third reason might well create a triable issue in a different case, but not here. If the law were to permit a claim for aiding and abetting even when the underlying claim of discrimination fails, the Court doesn't rely on immunity to find that the SCSO Defendants are nevertheless entitled to judgment on Plaintiff's third claim of relief for aiding and abetting. As noted above, there is simply no evidence that creates a genuine dispute as to any material fact suggesting that the SCSO Defendants somehow aided and abetted the discriminatory termination of Plaintiff's job.

This leaves for the Court to consider whether summary judgment should be granted to the SCSO Defendants on Plaintiff's first claim for relief under 42 U.S.C. § 1983 for false arrest and malicious prosecution, and on his fourth claim for relief for intentional infliction of emotional distress. (Doc. 33, PageID #385, 391) These are the claims against the SCSO Defendants on which Plaintiff has not opposed summary judgment.

"[W]hen faced with an unopposed motion for summary judgment, the district court cannot grant a motion for summary judgment without first considering supporting evidence and determining whether the movant has met its burden." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013). The law instructs that the Court cannot grant summary judgment in favor of the SCSO Defendants simply because Plaintiff has chosen not to respond to their motion. The movant always bears the burden of demonstrating the absence of a genuine dispute as to a material fact pursuant to Fed. R. Civ. P. 56(c). "The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). *See also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 380–81 (6th Cir. 2011).

Where Plaintiff has chosen not to oppose their motion for summary judgment, the SCSO Defendants must still point to evidence that meets the requirement of showing no genuine dispute as to any material fact. "The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party." *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378

(6th Cir. 1993) (citing *60 Ivy St. Corp. v. Alexander*, 822, F.2d 1432, 1435 (6th Cir. 1987)). Therefore, for two of the three causes of action Plaintiff brings against two of the SCSO Defendants (Barry and Rhoades) and for all three of the causes of action Plaintiff bring against one of the SCSO Defendants (Kline), the Court "may rely on the moving party's unrebutted recitation of the evidence in reaching a conclusion that facts are uncontroverted and that there is no genuine issue of material fact." *Jones v. Kimberly-Clark Corp.*, slip op., 2000 WL 1800475, at *3 (6th Cir. Nov. 28, 2000) (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 410 (6th Cir. 1992)). Furthermore, because Plaintiff has not opposed the SCSO Defendants' motion for summary judgment as to all defendants or all causes of action, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record." *Guarino*, 980 F.2d at 405.

Under these standards, the Court turns to Plaintiff's first claim for relief under 42 U.S.C. § 1983 for false arrest and malicious prosecution allegedly in violation of the Fourth Amendment. "A false arrest claim requires the 'plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.' " *Smith v. Silvernail*, slip op., 2025 WL 80370, at *5 (6th Cir. Jan. 13, 2025) (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)). More fundamentally, the defendant has to be the person who either arrested the plaintiff or swore false statements in a warrant affidavit. *Schulz v. Gendregske*, 544 F. App'x 620, 625 (6th Cir. 2013).

To make out a malicious prosecution claim, a plaintiff must establish that: "(1) the defendant 'made, influenced, or participated in the decision to prosecute'; (2) the

government lacked probable cause; (3) the proceeding caused the plaintiff to suffer a deprivation of liberty; and (4) the prosecution ended in the plaintiff's favor." *Lester v. Roberts*, 986 F.3d 599, 606 (quoting *Jones v. Clark County, Kentucky*, 959 F.3d 748, 756 (6th Cir. 2020), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022)). *See also Thompson v. Clark*, 596 U.S. 36, 49 (2022); *Lackey v. Hurley*, __ F.4th __, 2026 WL 2654666, at *5 (6th Cir. Sept. 9, 2026).

It is undisputed that the SCSO Defendants neither arrested nor prosecuted Plaintiff. The authority and discretion to do so rested solely with the Akron PD and the Summit County Prosecutor, which are governmental entities separate and apart from and outside the control of the SCSO Defendants. (Doc. 218-1, PageID #6678) It is also undisputed that the Akron PD handled the criminal investigation of Plaintiff on the first indictment on charges of rape, sexual battery, gross sexual imposition, and kidnapping. The arresting officers were not the SCSO Defendants, but rather the Akron PD. Although Defendant Kline conducted the criminal investigation as to the OHLEG violations, his investigation was carried out at the direction of the OAG, and the authority and discretion to prosecute Plaintiff on those violations rested solely with the Summit County Prosecutor.

It is also undisputed that the deprivation of liberty consisted of Plaintiff's initial arrest on July 20, 2017. An order for pretrial release on a cash bond issued the following day. (Doc. 207-17, PageID #5034) But "an 'initial arrest alone is an insufficient deprivation of liberty' to support a claim for malicious prosecution." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 876-77 (6th Cir. 2020) (quoting *Noonan*

*v. County of Oakland*, 683 F. App'x 455, 463 (6th Cir. 2017)).

It is also undisputed that the prosecution of Plaintiff arose out of indictments resulting from the grand jury process, thus demonstrating probable cause. The bar for showing probable cause is not high. "Probable cause exists when a reasonable person would believe that a suspect is guilty of a crime based on the facts and circumstances presented." *Lackey*, __ F.4th __, 2026 WL 2654666, at *3 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018)). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 583 U.S. at 57.

Moreover, Plaintiff does not challenge that "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). "And where a plaintiff 'was indicted by a grand jury,' that fact 'generally serves as rebuttable "proof of probable cause." ' " *Smith*, slip op., 2025 WL 80370, at *6 (quoting *Price v. Montgomery County, Kentucky*, 72 F.4th 711, 725 (6th Cir. 2023) (quoting *King v. Harwood*, 852 F.3d 568, 587 (6th Cir. 2017))).

The SCSO Defendants have shown that there is no genuine dispute as to the fact that there was probable cause to arrest Plaintiff in light of the indictments against him. The SCSO Defendants have also shown that there is no genuine dispute as to the fact that none of the SCSO Defendants were the arresting officers or swore statements in a warrant affidavit. Because the SCSO Defendants have thus shown that Plaintiff is

unable to prove the elements necessary for false arrest, they are entitled to judgment on Plaintiff's first cause of action as it relates to false arrest.

The SCSO Defendants have similarly shown that there is no genuine dispute as to the fact that none of the SCSO Defendants made, influenced, or participated in the decision to prosecute; or the fact that the government had probable cause to prosecute Plaintiff as reflected in the two indictments handed down by the grand jury; or the fact that Plaintiff did not suffer a deprivation of liberty beyond his initial arrest. Because the SCSO Defendants have thus shown that Plaintiff is unable to prove the elements necessary for malicious prosecution as to these defendants, they are entitled to judgment on Plaintiff's first cause of action as it relates to malicious prosecution.

The SCSO Defendants raised a qualified immunity defense as to Plaintiff's first cause of action against them. (Doc. 218-1, PageID #6682-84) "Officers are entitled to qualified immunity at summary judgment 'when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate clearly established constitutional rights of which reasonable person would have known.' " *Lacky*, __ F.4th __, 2026 W 2654666, at *2 (quoting *Cotton v. Hughes*, 176 F.4th 886, 897 (6th Cir. 2026) (citation modified)). Because the SCSO Defendants have shown that there is no genuine dispute as to material facts necessary to show false arrest and malicious prosecution, it is unnecessary to address the SCSO Defendants' claim of qualified immunity.

The Court turns to Plaintiff's fourth cause of action against the SCSO Defendants, namely, the intentional infliction of emotional distress under Ohio law.

(Doc. 33, PageID #391) Plaintiff chose not to oppose summary judgment on this claim. The Court nevertheless needs to determine whether the SCSO Defendants have discharged their burden under Fed. R. Civ. P. 56.

To establish a claim for intentional infliction of emotional distress, Ohio law requires Plaintiff to prove:

> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Lombardo v. Mahoney*, 2009-Ohio-5826, ¶ 6 (8th Dist.) (citing *Ashcroft v. Mt. Sinai Medical Ctr.*, 68 Ohio App.3d 359, 366 (8th Dist. 1990)).

Ohio law has set the bar "very high" for extreme and outrageous conduct for this tort which is met in only "the rare case." *Lombardo*, *id.*, ¶ 7. "Clearly, not every wrong is outrageous. Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 72 Ohio App.3d 417, 423 (2d Dist. 1991).

In recognizing this cause of action, the Ohio Supreme Court adopted the standard spelled out in the Restatement of the Law 2d, Torts (1965) 71, Sec. 46(1): "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union*

*20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 374 (1983), *overruled in part on other grounds by Welling v. Weinfeld*, 113 Ohio St.3d 464 (2007). That court found the Restatement's comment on extreme and outrageous conduct "to be instructive in describing this standard." *Yeager*, *id.* That comment read in part:

> "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

*Yeager*, 6 Ohio St.3d at 374-75 (quoting RESTATEMENT, *id.*, at 73).

Federal courts applying this law recognize the very high bar for showing extreme and outrageous conduct. *See*, *e.g.*, *Kovac v. Superior Dairy, Inc.*, 930 F. Supp. 2d 857, 870 (N.D. Ohio 2013) (citing and quoting federal cases applying Ohio law). The narrow reading reflects another concern expressed by those courts. "[A]n employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (citations omitted). *See also Kovac*, 930

F. Supp. 2d at 871.

In his fourth claim for relief as to the SCSO Defendants, Plaintiff has failed to show any conduct by defendants so extreme and outrageous as to go beyond the bounds of decency or to be considered intolerable to a civilized community. The criminal proceedings against Plaintiff were based upon probable cause. Probable cause didn't appear out of thin air. It was established through a criminal investigation by the Akron PD for the first indictment and through a criminal investigation at the direction of the OAG and handled by the SCSO for the supplemental indictment. The prosecution itself was handled by the Summit County Prosecutor and ultimately by way of presentment to two grand juries. Nothing in the record suggests that any conduct by the SCSO Defendants regarding these steps rose to the very high bar of extreme and outrageous conduct as necessary to show intentional infliction of emotional distress.

The same holds true for the termination of Plaintiff's job. It is undisputed that Defendant Barry terminated Plaintiff's job only after a full investigation into the OHLEG violations as directed by the OAG and as carried out by Defendant Kline; only after a pre-disciplinary hearing per the terms of the collective bargaining agreement generally governing employer-employee relations at the SCSO; only after a disciplinary committee unanimously recommended to Defendant Barry to terminate Plaintiff's job; and only after Defendant Barry exercised his lawful authority and discretion in accepting and executing that recommendation.

The Court will address more fully Plaintiff's protests against the finding of probable cause in the next section adjudicating the summary judgment motions of

defendants Jerome Patrick McMillan and Gerald Forney. As for the SCSO Defendants, though, they have met their burden of showing that there is no genuine dispute as to any material fact regarding the fourth cause of action Plaintiff brought against them. (Doc. 218-1, PageID #6694-95) Further, the SCSO Defendants are entitled to judgment as a matter of law on the fourth cause of action.

*Motion for summary judgment by Defendants Detective Jerome Patrick McMillan and Lieutenant Gerald E. Forney.* The Court next considers the summary judgment motion filed by two defendants associated with the City of Akron Police Department: retired Detective Jerome Patrick McMillan and retired Captain Gerald Forney. (Doc. 207, PageID #4970) These Akron PD Defendants were the first officers to meet with Moriah Asefi after Akron police received a report of a sexual assault that had allegedly occurred in the early hours of March 19, 2017. They subsequently carried out the criminal investigation that led to the indictment of Plaintiff on one count of rape, two counts of sexual battery, one count of gross sexual imposition, and one count of kidnapping (CR-2017-07-2512) in July 2017. Defendant Forney testified before the grand jury that returned the indictment against Plaintiff.

The basic undisputed facts of the Akron PD Defendants' involvement with the criminal investigation include the following. (Doc. 204-2, PageID #4469) At about 1:00 p.m. on March 19, 2017, the Akron PD received a report of a sexual assault. After the report of the crime, the Akron PD Defendants went to the Akron General Medical Center to interview Ms. Asefi. They interviewed her once at the hospital and then once

at the police station the following day. In both interviews, Ms. Asefi reported that she had been sexually assaulted by a black deputy wearing a full uniform and hat in a sheriff cruiser. She further reported that the officer forced her to perform oral sex on him near the Wood Apartments complex on Romig Road in Akron, Ohio. Highlights of the interviews included a statement that his penis had a lot of skin on it. She wasn't sure if the attacker wasn't circumcised, but remembered that there was a lot of skin.

The Akron PD Defendants investigated Ms. Asefi's statements. (Doc. 204-2, PageID #4473) They learned from the SCSO that two deputies fit the attacker's description insofar as the accuser described him as a black male Summit County Sheriff's deputy who dressed in uniform with an accompanying hat and who worked secondary jobs at the Woods Apartments. The Akron PD Defendants subsequently confirmed that Plaintiff was working at the Woods Apartments on the evening of March 18th and the early hours of March 19th. They confirmed this fact by getting the log sheets from the manager of the Woods Apartments complex which showed that Plaintiff was performing the extra surveillance work there from March 18, 2017 starting at 10:00 p.m. and finishing on March 19, 2017 at 2:00 a.m. They also obtained security footage from a nearby IHOP and Wal-Mart which showed that the accuser had been dropped off by a vehicle that looked similar to a deputy sheriff's cruiser.

After the second interview on March 20th, another Akron PD officer conducted a photo array containing six photos for the accuser to review. Ms. Asefi identified Plaintiff as her attacker. (Doc. 204-2, PageID #4479, 4561)

The Akron PD Defendants also conducted a non-custodial interview of Plaintiff

on April 12, 2017. (Doc. 204-2, PageID #4476; Doc. 199-3, PageID #2935) During the interview, Plaintiff confirmed that he was working an extra job at the Woods Apartments in his uniform, though in an unmarked car, over the course of the evening from March 18th from 10:00 p.m. to March 19th at 2:00 a.m. When shown a photo of Ms. Asefi, Plaintiff stated that she looked a little like a woman he talked to while working his extra job on Romig Road. He stated that she was talking very loud on her cell phone while walking down Romig Road. He made contact to advise her to keep her voice down while near the apartments. He further stated that the female was trying to get to a hotel that she was staying at. Plaintiff apparently looked up on his phone some hotels in the area and a cab company. He couldn't recall if the female had been drinking.

Plaintiff said he was in his unmarked car that evening. He was asked if he was sure about this detail. He said he would have to check, but was pretty sure it was his unmarked car. Plaintiff denied having any physical contact with the accuser. When asked if his DNA would be found on her, Plaintiff acknowledged that he may have shaken her hand or let her touch his phone. A buccal swab for Plaintiff's DNA was taken, and someone photographed Plaintiff's genitals pursuant to a search warrant. During his interview, Plaintiff said that he had been circumcised.

Plaintiff names the Akron PD Defendants in the first cause of action for violation of 42 U.S.C. § 1983 for false arrest and malicious prosecution in violation of the Fourth Amendment; in the fourth cause of action for intentional infliction of emotional distress; and in the fifth cause of action for malicious prosecution under

Ohio law. (Doc. 33, PageID #385, 391, 393) Plaintiff indicated in his opposition brief that he does not oppose summary judgment "on his claims for false arrest and intentional infliction of emotional distress." (Doc. 239, PageID #8156, n.1) The Court will, therefore, first turn its attention to the Akron PD Defendants' summary judgment motion as it relates to malicious prosecution and false arrest under federal law in the first claim for relief and under state law in the fifth claim for relief.

As noted above in the Court's adjudication of the SCSO Defendants' motion for summary judgment, under federal law "[a] false arrest claim requires the 'plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.' " *Smith v. Silvernail*, slip op., 2025 WL 80370, at *5 (quoting *Sykes*, 625 F.3d at 305). To be successful with his malicious prosecution claim under federal law, Plaintiff must establish that: "(1) the defendant 'made, influenced, or participated in the decision to prosecute'; (2) the government lacked probable cause; (3) the proceeding caused the plaintiff to suffer a deprivation of liberty; and (4) the prosecution ended in the plaintiff's favor." *Lester*, 986 F.3d at 606 (quoting *Jones*, 959 F.3d at 756). *See also Ellis v. Yasenchack*, slip op., 2025 WL 2427724, at *2-3 (6th Cir. Aug. 22, 2025) (citing *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017)). This means Plaintiff "must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person." *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 558 (2024) (citing *Thompson*, 596 U.S. at 43 and n.2). *See also Lackey*, __ F.4th __, 2026 WL 2654666, at *5.

As noted earlier in this order, it is undisputed that the deprivation of liberty

consisted of Plaintiff's initial arrest. The law indicates that the initial arrest alone is an insufficient deprivation of liberty to support a claim for malicious prosecution. *Wright*, 962 F.3d at 876-77. In adjudicating the Akron PD Defendants' motion for summary judgment as it relates to the first cause of action, however, the Court pushes aside this issue to grapple instead with the one requirement both false arrest and malicious prosecution in federal law have in common: probable cause. If the Akron PD Defendants show that there is no genuine dispute as to probable cause being present, then Plaintiff cannot prove his first cause of action as to the Akron PD Defendants. They would then be entitled to judgment in their favor on this claim as a matter of law.

The Fourth Amendment's guarantee at issue in Plaintiff's first cause of action is the following: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONSTIT., AMEND. IV.

The language of what we are protecting is far more straightforward than the language of probable cause. "Because probable cause 'deals with probabilities and depends on the totality of the circumstances,' . . . it is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules.' " *Wesby*, *supra*, 583 U.S. at 57 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such

activity.' " *Wesby*, *id.* (quoting *Gates*, 462 U.S. at 243-44, n.13). The Supreme Court has cautioned that "[p]robable cause 'is not a high bar.' " *Wesby*, *id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "That is why a grand jury's finding of probable cause to think that a person committed a crime 'can be [made] reliably without an adversary hearing.' " *Kaley*, *id.* (quoting *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975)). "[I]t is and 'has always been thought sufficient to hear only the prosecutor's side.' " *Kaley*, *id.* (quoting *United States v. Williams*, 504 U.S. 36, 51 (1992)).

Our Circuit's law reflects this law from the Supreme Court. "Probable cause 'is not a high bar.' " *Henderson v. Village of New Holland, Ohio*, 186 F.4th 357, 364 (6th Cir. 2026) (quoting *Wesby*, 583 U.S. at 57). *See also Lackey*, __ F.4th __, 2026 WL 26564666, at *3. Probable cause "requires 'only a probability or substantial chance' based on the 'totality of the circumstances,' . . . that a [defendant] 'has committed, is committing, or is about to commit an offense.' " *Henderson*, *id.* (quoting *Wesby*, 583 U.S. at 57, and *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "The Fourth Amendment requires officers to 'be reasonable,' 'not to be perfect.' " *Henderson*, *id.* (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "Because 'reasonable men make mistakes,' an officer's misapprehension of a relevant fact or point of law does not defeat a finding of probable cause." *Henderson*, *id.* (quoting *Heien*, 574 U.S. at 61). This is also why "[q]ualified immunity protects officers 'who mistakenly but reasonably conclude that probable cause exists.' " *Lackey*, __ F.4th __, 2026 WL 26564666, at *3 (quoting *Lester*, 986 F.3d at 607).

Adjudicating Plaintiff's claim against the Akron PD Defendants for malicious prosecution under federal law brings to light the dangers in the law and elsewhere of failing to see the forest for the trees. Plaintiff seeks to do what the law prohibits, namely, to "conflate[] two standards of proof—the modest requirement that probable cause exist to prosecute someone and the stringent requirement that proof beyond a reasonable doubt exist to find him guilty." *Newman v. Township of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014) (citing *United States v. Ventresca*, 380 U.S. 102, 107 (1965)). He insists on "fine-tooth combing over every detail [which] seems more suited for arguments to the jury about why the government did not prove its case beyond a reasonable doubt than arguments . . . about why probable cause did not exist for the government to bring that case." *Lester*, 986 F.3d at 610.

It bears repeating: "the burden to establish the probable cause necessary to initiate a suit (and a pretrial detention) is much lower than the burden necessary to obtain a conviction." *Lester*, *id.* (citations omitted). And "[p]robable cause 'is not a high bar.' " *Wesby*, 583 U.S. at 57 (quoting *Kaley*, 571 U.S. at 338).

The Akron PD Defendants have shown that there is no genuine dispute as to probable cause being present to have allowed the state to proceed with the criminal charges against Plaintiff; and further, that they are entitled to a judgment in their favor as a matter of law. "[T]he presence of probable cause for a prosecution or pretrial detention dooms any Fourth Amendment claim." *Lester*, 986 F.3d at 609 (citations omitted). *See also Artuso v. Felt*, slip op., 2024 WL 495763, at *4 (6th Cir. Feb. 8, 2024); *Fox v DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007*), abrogated on other grounds*

*by Pearson v. Callahan*, 555 U.S. 223 (2009) (malicious prosecution claims fail "when there was probable cause to prosecute"). Because of the presence of probable cause to proceed with the criminal charges against Plaintiff, his malicious prosecution claim against the Akron PD Defendants cannot succeed.

By getting knee-deep in the weeds of this case, Plaintiff wishes to draw the Court into a determination of reasonable doubt. That's not the test the Court needs to consider. It is instead the far different determination whether probable cause exists to prosecute. That far more modest requirement is amply met in this case.

To determine whether probable cause to prosecute and arrest Plaintiff existed, the Court examines the events leading up to the prosecution and arrest, and then decides whether those historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *Green v. Perkins*, slip op., 2026 WL 373038, at *5 (6th Cir. Feb. 10, 2026), *pet. for writ of certiorari docketed, Green v. Perkins*, Case No. 26-69 (July 15, 2026) (quoting *Wesby*, 583 U.S. at 56-57). From that perspective, the facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that Plaintiff had committed the offenses at issue. *Green*, *id.* (quoting *DeFillippo*, 443 U.S. at 37). "That is not a high hurdle." *Green*, *id.*

It is uncontested that on March 19, 2017, the Akron PD learned of a sexual assault that allegedly occurred in the wee hours of the morning that day. The accuser, Moriah Asefi, reported that an individual dressed in a SCSO deputy uniform who was near the Wood Apartments complex on Romig Road in Akron, Ohio, forced her to

perform oral sex on him while both were in a police cruiser. The description she gave of her assailant was sufficient to prompt the SCSO to identify two possible deputies, one of whom was Plaintiff. When presented with a blind array of six photos, Ms. Asefi selected Plaintiff's photo as her attacker.

Subsequent investigation by the Akron PD revealed that Plaintiff was in fact undertaking a secondary work assignment at the location and on the date and at the time of the alleged crimes. The log sheets obtained from the apartment manager showed that Plaintiff was the only individual on that particular secondary work assignment that night. This corroborative evidence was confirmed by Plaintiff's own admissions, who also acknowledged that he had contact with a female that night at that location whom he was trying to assist in finding a hotel for the night.

The Akron PD Defendants learned in interviewing Ms. Asefi that her assailant then drove her to an IHOP restaurant where she exited the car. The restaurant's video corroborates her presence in that restaurant from approximately 3:22 a.m. to 3:45 a.m. that morning. The Akron PD Defendants obtained from a Walmart store located near the IHOP restaurant the store's surveillance video from one of the security cameras that points to the back of the IHOP restaurant. At approximately 3:14 to 3:16 a.m. that morning, the video shows a vehicle that looks similar to a marked SCSO cruiser drive behind the IHOP restaurant and stop at the stairs going up to the restaurant.

In their investigation, the Akron PD Defendants interviewed a cab driver who told them that sometime after 4:00 a.m. that morning, he had picked up a female at a local Econo Lodge. The woman told the cab driver about a deputy sheriff who forced

her to have sex. She told the cab driver that it happened in a cop car.

Where, as here, these material facts as part of the history leading up to the charging and arrest of Plaintiff are not in dispute, "probable cause 'retains its legal character' and must be decided by the court." *Newman*, 773 F.3d at 773 (quoting *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005)). *Accord Lester*, 986 F.3d at 612 (quoting *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020)). After drawing all inferences in Plaintiff's favor, the Court finds that no reasonable jury could find no probable cause. The Akron PD Defendants have shown that there is no genuine as to the presence of probable cause. Because showing that the government lacked probable cause is a necessary element for proving malicious prosecution, Plaintiff's first claim for relief against the Akron PD Defendants cannot succeed. The Akron PD Defendants are, therefore, entitled to judgment in their favor on Plaintiff's first claim for relief for malicious prosecution under federal law.

The Court is mindful of Plaintiff's challenges concerning the indictment itself, certain facts contained in the police reports, and inconsistencies in the evidence. These types of challenges find their way into vast numbers of criminal cases filed each day across the country. And skilled defense counsel can from time to time leverage these weaknesses in the prosecution's case into an acquittal for the defendant. Those challenges, though, go to a finding of guilt under a beyond-a-reasonable-doubt standard.

Probable cause is very different. The law in writing must be the law in practice. Probable cause is not a high bar, and it has been amply met here with undisputed facts.

"Because '[t]here is no requirement that the defendant [to a malicious-prosecution charge] must have evidence that will ensure a conviction,' . . . not every failed criminal prosecution will sustain a subsequent malicious-prosecution suit." *Harris v. United States*, 422 F.3d 322, 327 (6th Cir. 2005) (quoting *Deoma v. Shaker Heights*, 68 Ohio App.3d 72, 77 (8th Dist. 1990), and citing *Huber v. O'Neill*, 66 Ohio St.2d 28, 29-30 (1981)).

Plaintiff goes further than these types of challenges, though. He accuses the Akron PD Defendants of altering the accuser's statement, concocting false stories about Plaintiff's conduct in the alleged crimes, falsifying physical descriptions of the assailant, intentionally omitting facts including exculpatory information from police reports, and other inaccuracies, some intentional and others not. (Doc. 239, PageID #8165-67, 8170, 8172, 8174, 8176, 8177, 8181)

These additional challenges to the evidence and accusations against the Akron PD Defendants do not change the Court's finding of probable cause. "[O]ur analysis focuses on whether enough evidence exists to support a charge. Indeed, 'after the officer determines, on the basis of the facts and circumstances known to him that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence.' " *Lackey*, __ F.4th __, 2026 WL 2654666, at *5 (quoting *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007)).

The Court does not rest its finding of probable cause on the law that an indictment " 'fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to

answer.' " *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) (quoting *Ex parte United States*, 287 U.S. 241, 250 (1932)). *See also Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). It could have done so, though.

Plaintiff tries to rebut the presumption of probable cause which an indictment carries by highlighting purported weaknesses in the state's case and accusing the Akron PD Defendants of falsifying their reports and the like. (Doc. 239, PageID #8180-81) He fails, however, to meet the requirement that he "show specific evidence demonstrating that a 'defendant has knowingly presented false testimony to the grand jury to obtain an indictment.' " *Smith*, slip op., 2025 WL 80370, at *6 (quoting *Gonzalez v. Kovacs*, 687 F. App'x 466, 469 (6th Cir. 2017) (quotation and citation omitted)). In the absence of any evidence to make that showing, Plaintiff fails to rebut the presumption that a grand jury indictment conclusively determines the existence of probable cause.

Plaintiff also seeks to assert his fifth claim for relief against the Akron PD Defendants for malicious prosecution under Ohio law. (Doc. 33, PageID #393) The elements of the tort of malicious criminal prosecution under Ohio law are "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Trussell v. General Motors Corp.*, 53 Ohio St.3d 142, 146 (1990).

The Akron PD Defendants point out that Plaintiff failed to account for the added requirement of malice under Ohio law. (Doc. 207, PageID #4994) They are correct to note that nothing in the record shows that they or anyone else demonstrated malice

in instituting or continuing the prosecution against Plaintiff.

Furthermore, in light of the above discussion regarding Plaintiff's malicious prosecution claim under federal law, Plaintiff's same claim under Ohio law cannot succeed because of the second prong under *Trussell v. General Motors Corp.* The Court's finding that there is no genuine dispute as to probable cause being present for prosecuting the criminal case against Plaintiff applies equally to Plaintiff's claim for malicious prosecution whether he brings it under federal law or state law. In both situations, there was no lack of probable cause to prosecute and arrest Plaintiff. "If the plaintiff cannot show lack of probable cause, the claim for malicious prosecution fails as a matter of law." *Georgin v. Georgin*, 2022-Ohio-4328, ¶ 15 (12th Dist.). Consequently, Plaintiff's claim for malicious prosecution under Ohio law cannot succeed, and the Akron PD Defendants are entitled to a judgment on that claim as a matter of law, whether the claim is adjudicated under federal law or under state law.

Although he chose not to oppose summary judgment for the Akron PD Defendants on his first claim for relief for false arrest under federal law (Doc. 33, PageID #385) and on his fourth claim for relief for intentional infliction of emotional distress under Ohio law (*Id.*, PageID #391), the Court must still review the record to determine if the Akron PD Defendants have met their burden under Fed. R. Civ. P. 56 and are consequently entitled to summary judgment in their favor on these particular claims. *Byrne*, 541 F. App'x at 675; *Carve*, 946 F.2d at 455. They have done so on both claims.

"A false arrest claim under federal law requires a plaintiff to prove that the

arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (citing *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citation omitted)). The Court's earlier finding of probable cause extends to Plaintiff's arrest on July 20, 2017. Because the arresting officer did not lack probable cause to arrest Plaintiff, Plaintiff's claim for false arrest fails as a matter of law.

Plaintiff's first claim as to false arrest runs into another problem. The Akron PD Defendants argue (Doc. 207, PageID #4979) that a two-year statute of limitations applies to claims under 42 U.S.C. § 1983 in Ohio. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc) (employing the two-year statute of limitations under Ohio Rev. Code § 2305.10)). The statute of limitations for a false arrest claim brought under Ohio law is only one year. *Daly v. Certo*, 2025-Ohio-293, ¶ 54 (2d Dist.); Ohio Rev. Code § 2305.11(A). The cause of action accrues "when the state initiates legal process against the plaintiff, such as through arraignment or formal charging." *Codrington v. Dolak*, 142 F.4th 884, 892 (2025).

The state trial court ordered the warrant to arrest Plaintiff on July 20, 2017, and the warrant issued that same day. Plaintiff was arraigned and released on bond the following day. Plaintiff filed his initial complaint in this federal lawsuit on March 10, 2021. (Doc. 1, PageID #1) Given the lapse of time, Plaintiff's claim for false arrest under 42 U.S.C. § 1983 as to the Akron PD Defendants is time-barred. Accordingly, the Akron PD Defendants are entitled to a judgment in their favor on Plaintiff's first

claim for relief for false arrest under 42 U.S.C. § 1983.

Plaintiff also named the Akron PD Defendants in his fourth claim for relief for intentional infliction of emotional distress under Ohio law. As noted earlier when the Court examined this claim as to the SCSO Defendants, Ohio law requires Plaintiff to show that:

> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Lombardo*, 2009-Ohio-5826, ¶ 6 (8th Dist.) Ohio law has set the bar "very high" for extreme and outrageous conduct for this tort which is met in only "the rare case." *Lombardo*, *id.*, ¶ 7.

Nothing Plaintiff alleges in his opposition brief or elsewhere in the record suggests that the conduct of the Akron PD Defendants was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community. Under Ohio law, the Court may dismiss a claim for intentional infliction of emotional distress when the alleged conduct does not as a matter of law reach the level of extreme and outrageous conduct. *Benkowski v. Trafis*, 2015-Ohio-5139, ¶ 54 (8th Dist.).

By choosing not to oppose summary judgment on this fourth cause of action, Plaintiff has made no showing how any of the objectionable actions he alleged against

the Akron PD Defendants proximately caused him psychological injury. Similarly, there is nothing in the record to show that Plaintiff suffered serious mental anguish as a result of the Akron PD Defendants' alleged actions that was of such a nature that no reasonable person could be expected to endure it. Ohio law requires Plaintiff to present some evidence beyond his own testimony that he has experienced emotional distress due to the Akron PD Defendants' actions. *Daly*, 2025-Ohio-293, ¶ 79.

The absence of any record evidence to support multiple elements of a claim for intentional infliction of emotional distress means that Plaintiff cannot succeed on his fourth claim against the Akron PD Defendants. As to this claim, therefore, there is no genuine dispute as to any material fact, and the Akron PD Defendants are entitled to a judgment in their favor as a matter of law.

## IV.

Would the Court's findings of fact or conclusions of law change if the testimony of Plaintiff's proposed expert Robert W. Metzger were to be considered? Answering this question takes us to the final step of the legal analysis, which is consideration of Defendant Sheriff Fatheree and the SCSO Defendants' joint motion to exclude testimony and evidence of Plaintiff's expert. (Doc. 211, PageID #5494) The testimony and materials are being offered to prove whether the SCSO's employment actions conformed to the established professional standards and police procedures concerning the internal investigation and subsequent termination of Plaintiff's job. Plaintiff has opposed this motion. (Doc. 241, PageID #8220) The Motion Defendants have in turn

replied. (Doc. 253, PageID #8404)

The joint motion lays out several paths for excluding Plaintiff's expert. The Motion Defendants argue the Evid. R. 702 precludes the expert and related materials because Metzger is not qualified, the testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue, and the testimony is not reliable. The Motion Defendants also argue that the expert's report is based upon limited sources of data that fail to take into account all the relevant facts and circumstances of the case, and there has been no independent investigation conducted and no reliable methodology utilized.

Plaintiff opposes these grounds, but comes close to acknowledging some of the weaknesses of his expert that the Motion Defendants point out. For example, Plaintiff recognizes that his expert did not review all the documents the Motion Defendants believe are important to the issue on which the expert opines. He also recognizes that the parties may have a disagreement with the methodology the expert used in preparing his report. Plaintiff dismisses these issues by holding them up as fertile ground for cross-examination. (Doc. 241, PageID #8288)

In their reply, the Motion Defendants again highlight their three major concerns with the expert (lack of the specialized knowledge required for the case, failure to review critical evidence, application of no reliable methodology). They raise a fourth: a concern that Plaintiff's expert is offering opinions on the ultimate issue of racial discrimination that invade the province reserved for the Court and/or the jury. (Doc. 253, PageID #8404)

The Court shares all four concerns, even while recognizing that rejection of expert testimony is normally the exception rather than the rule. *See*, *e.g.*, Evid. R. 702, Comm. Notes—2000 Amendment; *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008). The Court is concerned about the expert's limited qualifications with regard to the operation of the OHLEG system, including the day-to-day operation of the system. The Court is concerned about whether the expert's testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, or just confuse the trier of fact. The Court is concerned about the reliability of the testimony, especially since both sides of the motion under consideration seem to agree that the expert may not have looked at all key materials relevant to the issues in this case.

The Court is most concerned that the testimony and report invade the province of the Court and the jury by telling us what result to reach on the ultimate legal questions in this litigation. *See*, *e.g.*, *In re Heparin Products Liability Litigation*, 803 F. Supp. 2d 712, 753 (N.D. Ohio 2011) (finding that an expert "instructing the jury" is the province of the court, and expert testimony that "constitutes mere personal belief as to the weight of the evidence invades the province of the jury"); *Buddenberg v. Estate of Weisdack*, 711 F. Supp. 3d 712, 768 (N.D. Ohio 2024) ("an expert may not invade the province of the court by conveying or expressing legal standards or terminology to the jury"); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019) (addressing the inadmissibility of expert testimony that invades the province of the jury by opining on what result to reach). This last concern arises in

part from the very first paragraph of the expert's report. In the introduction he says:

> I have been retained . . . to analyze this case, providing assessments and conclusions regarding the employment actions of the Summit County Sheriff's Office . . . resulting in the termination of Antonio Williamson from his employment as a Sheriff Lieutenant with the department. Furthermore, I was tasked with formulating opinions regarding whether the SCSO employment actions conformed to established professional standards and widely recognized police procedures concerning the internal investigation and final disposition (termination) of employee Lieutenant Antonio Williamson.

(Doc. 211-2, PageID #5767)

The termination of Plaintiff's job lies at the heart of a large piece of this case. It is nearly impossible to imagine the expert providing assessments and conclusions regarding that termination without invading the province of the jury and—now in the context of the summary judgment motions—the Court.

In the context of the facts of this case, reading this introduction raises a concern about the relevance of the testimony and a concern whether it would simply confuse the factfinder. *See* Evid. R. 401, 402, 403. First, whether the SCSO follows certain professional standards and police procedures has no relevance to this litigation. Surely an organization like the SCSO could follow professional standards and police procedures, and still discriminate. Equally true is the possibility that an organization does not follow these standards and procedures, and doesn't engage in racial discrimination.

Second, that the expert is prepared to opine on whether the SCSO's employment actions regarding Plaintiff's job termination conformed to established professional

standards and widely recognized police procedures clashes with the one obvious fact about his job termination that surfaces from the thousands of pages of record materials. This was anything but an ordinary, run-of-the-mill disciplinary action in a normal job setting where standardized procedures are likely to be sufficient.

For example, no one disputes that the OAG is the entity that authorizes audits of the use of the OHLEG system. No one disputes that the OAG is the entity that authorized and ran the audit in this instance. No one disputes that the OAG ordered that the results of the investigation associated with the audit be delivered to the Summit County Prosecutor.

The reason for this last step is simple: a person commits a fifth-degree felony under Ohio law by violating the rules and regulations that govern use of the OHLEG system. The audit showed that Plaintiff violated those rules and regulations in his misuse of the OHLEG system. The audit, therefore, is some evidence of the commission of a crime. In police departments across the country, evidence of criminal conduct is directed to the prosecutor to determine whether such evidence is sufficient to present to a grand jury and to charge the defendant. That's what the OAG directed the SCSO to do here. (Doc. 211-1, PageID #5515)

This directive came at a time when Plaintiff was under a five-count indictment for rape, sexual battery, gross sexual imposition, and kidnapping. That indictment expanded by ten more counts relating to the OHLEG violations. A trial ensued. An appeal on a key motion ensued. An arbitration ensued. Another appeal ensued. No party during the long history of this case has been able to point to a similar scenario.

That Plaintiff's expert could opine on whether the SCSO's employment actions conformed to established professional standards and procedures in this instance without reaching the ultimate legal issue about racial discrimination seems to be an impossible task. But it also seems to be an unnecessary one. After all, Plaintiff has not alleged any racial animus on the part of the OAG. To do so would have been highly unusual, since there is no insinuation, let alone evidence, that what the OAG did in this instance was somehow motived by Plaintiff's race. Moreover, to do so would have meant overcoming the fact that the individual deputized by the OAG to issue the directives that ultimately set into motion the investigation of Plaintiff for violating the OHLEG rules and regulations was herself black. (Doc. 211-1, PageID #5513) She testified that the directive she sent to the SCSO was based solely on her review of the OHLEG audit report that the SCSO had requested. She also testified that she didn't even know Plaintiff's race at the time. (*Id.*, PageID #5515)

The case record, voluminous as it is, contains no evidence that the OAG acted with any racial animus whatsoever in ordering the audit, in monitoring the audit, or in instructing the SCSO to forward the audit and the results from the related investigation to the Summit County Prosecutor. The OAG's directives triggered the steps that led to the additional charges against Plaintiff—almost costing him his freedom and ultimately costing him his job. No expert, especially one who himself professes no particular expertise in the operation of the OHLEG system or the OAG's supervision and enforcement of that system, can change these facts. This employment matter was in many ways sui generis. Adding pages of testimony from an expert who apparently

will opine on standardized protocols and procedures used in usual circumstances can only confuse and ultimately prove to be irrelevant in the circumstances of this case which were anything but usual.

For these reasons, the Court grants the Motion Defendants' request to exclude the testimony and evidence of Plaintiff's expert Robert Metzger.

* * * * *

Accordingly, for the reasons stated above, the Court GRANTS the summary judgments motions of the defendants in this litigation (resolving Docs. 207, 212, 213, and 218) and GRANTS the joint motion to exclude testimony and evidence of Plaintiff's expert Robert Metzger (resolving Doc. 211). Having found defendants are entitled to judgment in their favor as a matter of law on all claims against them, the Court hereby terminates this case.

IT IS SO ORDERED.

Dated: October 1, 2026

*/s/ John R. Adams*
JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE